POLARIS INDUSTRIES, a Division of Textron, Inc., Appellant,

v.

PLASTICS, INC., defendant and third party plaintiff, Respondent,

v.

AETNA CASUALTY AND SURETY COMPANY, third party defendant, Respondent,

and

Fusion Rubbermaid Corporation, third party defendant, Appellant.

Nos. 48033, 48116 and 48127.

Supreme Court of Minnesota.

Oct. 31, 1980.

Fredrikson, Byron, Colborn, Bisbee & Hansen, Jerome B. Pederson, and Michael A. Stern, Minneapolis, for Polaris Ind.

Lasley, Gaughan, Reid & Stich and John Angell, Richards, Montgomery, Cobb & Bassford, and Lynn Truesdell, III, Minneapolis, Jacobowski, Doffing, Hennessy, St. Paul, for Fusion Rubbermaid Corp.

Briggs & Morgan, David C. Forsberg, and Gerald L. Svoboda, St. Paul, for Plastics, Inc.

Faegre & Benson, Minneapolis, for Aetna Cas. and Sur. Co.

OTIS, Justice.

These three appeals arise out of the same transactions and have been consolidated for consideration and decision. The plaintiff, Polaris Industries (Polaris), has recovered damages against Plastics, Inc. (Plastics) and seeks review of an order denying it compensation for prejudgment interest and for loss of profits.

Plastics has in turn joined Fusion Rubbermaid Corporation (Fusion) as a third-party defendant, seeking indemnity. Fusion appeals from a judgment granting Plastics indemnity, assigning as error an order denying Fusion's motions to submit to the jury the question of Plastics' comparative negligence.

We reverse as to the denial of Polaris' claim for prejudgment interest and affirm as to the remaining issues which were raised in both cases.

The events leading up to this litigation occurred in April and May 1968. Polaris manufactures snowmobiles, and in early April 1968 began negotiations with Faribo Manufacturing Co., a subsidiary of Plastics, to explore the feasibility of fabricating plastic gasoline tanks from polyethylene resin as a substitute for steel tanks. Upon being reassured by representatives of Plastics that the material would be suitable and compatible with gasoline additives, and that it would be tested for compatibility, on April 11 Polaris placed an order with Plastics for some 23,000 tanks.

Sometime prior to April 17, representatives of Plastics met with Fusion personnel and later with Richard Massuch, the midwest manager of Fusion, all of whom also reassured Plastics that appropriate resin was available for manufacturing plastic gas tanks.

On May 21, 1968, Massuch wrote the following letter to George Freeborn, the president of Faribo, on which the trial court laid considerable stress in reaching its decision:

Dear George:

This letter serves as a follow-up to our conversations of last week concerning materials compounded and ground by Fusion Rubbermaid Corporation for Fuel Tank Applications. During the last 2 years, I have personally been involved in Fuel Tank programs with the following companies: Buick Motor Division, Flint, Michigan; A.M.F. Western Tool, Des Moines, Iowa; Gravely Tractor Division, Dunbar, West Virginia; Yardman of Illinois, Inc., Sullivan, Illinois; and Chrysler Outboard Corporation, Hartford, Wisconsin. There have been no failures as a result of the Gasoline–Polyethylene relationship.

Problems that have been encountered have arisen in the following areas. The design of the tank, molding techniques, and installation of the tank in the piece of equipment. These are the primary reasons we at Fusion cannot enter into any product guarantee as we have no control over any of the above mentioned areas. We are at the present time evaluating the resin recommended for use with some of the common De–Icers or fuel additives at your request. As soon as possible I will get these results to you.

Fusion has been a leader in the field of polyethylene powders specifically tailored for rotational molding for many years. We modify resins to improve molding characteristics, improve cold temperature properties, and improved stress crack resistance to special solutions. To date we have tested and evaluated six modified resins for use as fuel tanks. Special attention was given in the following areas. Possible deterioration of stress crack resistance, dimensional gain in percent, and weight gain in percent. Test specimens show no significant change in properties.

\* \* \* \* \* \*

On July 23, 1968, Plastics ordered from Fusion 230,000 pounds of white resin and began manufacturing the plastic tanks for Polaris, who bought 26,000 of them for its 1969 model snowmobiles.

Although the tanks performed satisfactorily during the winter months, in warm

weather the plastic material gradually absorbed gasoline and the tanks began to crack and split. According to Polaris's records more than 23,000 tanks failed and 17,897 were replaced from and after the early summer of 1969.

After a five–week trial the case was submitted to the jury on special verdicts which were answered in the following manner:

A. Polaris was found not negligent with respect to the design, use, or mounting of the polyethylene gasoline tanks.

B. Plastics was found negligent with respect to the design of, manufacturer of, or information supplied concerning the tanks causing failure of the tanks.

C. Plastics was found not negligent with respect to the design or manufacture of the tanks.

D. Plastics made the following warranties to Polaris, a breach of which caused Polaris's damages:

An express warranty and implied warranties of merchantability and fitness for a particular purpose.

E. Fusion was found negligent as to Plastics with respect to the manufacture of or information supplied concerning the polyethylene resin, causing failure of the tanks.

F. Fusion made the following warranties to Plastics, a breach of which caused the damages of Plastics:

An express warranty and implied warranties of merchantability and fitness for a particular purpose.

The jury then awarded Polaris damages in the amount of $208,391.98.

The trial court by order of May 18, 1977, adopted the jury's findings and held that as to the warranties, Plastics "served only as a conduit" and was without personal fault. Since the jury found Plastics not negligent as to design or manufacture, the court ordered Fusion to indemnify Plastics. In an accompanying memorandum, the court noted that the representations of Fusion in its letter of May 21, 1968, were "totally false" and went on to say:

This was the crux of the case, as the evidence overwhelmingly demonstrated that the tanks failed because of the adverse effect of gasoline on the polyethylene used in the manufacture of the tanks. The representations of Fusion, moreover, were relied upon by Plastics and were, in turn, passed along by Plastics' representatives to representatives of Polaris, and it was, for this reason, that the jury found Plastics to be negligent.

It is the law in Minnesota that indemnity may be granted to a party who justifiably relied upon representations made by another and thus is without personal fault but whose actions are, nevertheless, tortious. It is also the law that indemnity may be granted where the party seeking it has only a derivative or vicarious liability for damage caused by the one sought to be charged. * * *

Insofar as the breaches of warranty were concerned, those were intimately related to the fact that Plastics negligently supplied information to Polaris and were directly related to the fact of incompatibility of the polyethylene resin with gasoline. These breaches of warranty and negligence occurred because Plastics relied on the warranties of Fusion Rubbermaid Corporation, and Plastics thus has only a derivative or vicarious liability for the damage caused by Fusion Rubbermaid.

### The Polaris Appeal

*1. Prejudgment interest.*

The trial court denied prejudgment interest in the sum of $66,758.31 on the grounds that the damages were unliquidated and not readily ascertainable prior to trial, citing *Alley Construction Co., Inc. v. State*, 300 Minn. 346, 219 N.W.2d 922 (1974); and *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 189 N.W.2d 499 (1971).

We are of the opinion that Polaris has made a compelling case for obtaining prejudgment interest. With the exception of about $21,000 attributed by Polaris to the purchase of 2826 replacement tanks bought

by it elsewhere, the jury's award reflected item by item the exact amount of out-of-pocket expenses Polaris incurred in replacing the defective tanks with steel tanks. We acknowledge that there is merit to the concern expressed by the trial court in attempting to weigh the results reached by the jury against the possibility of substantial imprecision, in fixing prior to trial an amount which accurately reflects out-of-pocket damages. Nevertheless Polaris has persuasively presented precise figures and dates as follows:

1. A cost of $9,981 for obsolete caps and gauges with prejudgment interest from August 15, 1970 amounting to $4,067.44.

2. $19,732.50 spent in "covering" its requirements with steel tank replacements, with $8,780.96 interest from January 1, 1970.

3. $9,922.50 shipping costs with $4,415.51 interest from January 1, 1970.

4. $152,290.45 to replace 15,071 tanks at $101.05 per tank with $49,494.40 interest from December 31, 1971.

■ To the extent that the expenses incurred by Polaris were actually bookkeeping items ascertainable by reference to its business records they are distinguishable from the damages sought in *Keegan v. Fischer Construction Co., Inc.*, 302 Minn. 519, 223 N.W.2d 141 (1974), and *Alley Construction Co., Inc. v. State*, 300 Minn. 346, 219 N.W.2d 922 (1974), where interest on unliquidated claims was denied. In those cases there were numerous issues which required the jury to resolve uncertain fact questions and to exercise considerable independent discretion in arriving at its award. In the instant case, although the liability of defendants was by no means clear cut before trial, the computation of damages was relatively uncomplicated, and, in our opinion, meets the test of being "readily ascertainable by computation." Accordingly that claim is remanded to the district court for a determination of the dates from which prejudgment interest shall run with respect to each element of damages, consistent with the decision we here reach.

## 2. Loss of Profits.

In dealing with a motion by Polaris for a new trial to recover damages for loss of profits, the trial court assigned as its reason for having directed a verdict against Polaris the fact that there was insufficient foundation for an expert opinion which relied only on inferences, without facts, and on "inadmissible evidence of a wholly unreliable character." The court rejected documents furnished by a snowmobile association because of a disclaimer which showed them to be untrustworthy as a measure of profits in the industry. In addition, the court held that defects in the gas tank were only one reason for loss of profits.

We find this issue a particularly difficult one. Common sense and experience would seem to compel a finding that plaintiff lost some business which would have translated into profits but for the inevitably damaging impact of having thousands of its products found to be defective. Consequently, it is with some misgivings we affirm the trial court's decision as to this claim. The problem as we see it is one inherent in proof whenever loss of profits is sought.

Polaris relied strongly on showing that it sustained losses during years that the industry generally was doing an increased volume of business. Much of this testimony was excluded. Plaintiff claimed that it lost profits as a result of its inability to supply its distributors with completed units in a timely fashion, which caused inventory build-ups at the distributor and dealer levels, resulting in decreased orders from plaintiff in the spring of 1970.

In support of its theory of recovery, plaintiff submitted the testimony of Jack Merrill, the territory manager at plaintiff's Denver branch during the years here involved; Donald Erickson, plaintiff's general sales manager; and Herbert Howe, general sales manager in charge of plaintiff's products at plaintiff's largest independent distributor. In addition, numerous exhibits were submitted.

At best, plaintiff's evidence showed that there was some build-up of inventory at

the distributor and dealer levels, and that increased orders for 1971 model snowmobiles were not placed by plaintiff's largest independent distributor, because it had "a lot of carryover machines." In addition, there was testimony that, although plaintiff was experiencing other problems during the years involved in this lawsuit, the failure of the plastic gas tank was by far the most serious problem.

However, there was evidence tending to show that plaintiff manufactured fewer snowmobiles than it otherwise would have because of its inability to obtain steel gas tanks in time for its 1970 model year, or that it failed to sell any of the snowmobiles it did manufacture in the years in question. Thus, even if it is assumed that plaintiff's distributors and dealers experienced increases in their inventories, and that these inventory build—ups were caused by the gas tank problems, there is no evidence tending to show that plaintiff suffered a loss of profits as a result.

█ Recently we stated in *Leoni v. Bemis Co., Inc.,* 255 N.W.2d 824, 826 (Minn. 1977): "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." In the instant matter, plaintiff failed to prove the fact that it lost profits as a result of the defective gas tank.

Of crucial importance to plaintiff's proof was the testimony of Joseph Buchan, the director of management services with the accounting firm of Touche, Ross & Co., who had considerable experience in calculating lost profits caused by business interruptions. Mr. Buchan's testimony was excluded almost in its entirety after an extensive offer of proof, in which the witness was examined and cross—examined before the court in the absence of the jury. The trial court found the testimony, exhibits, and conclusions of the witness to lack foundation.

The principal objection made to some exhibits used by Buchan and the conclusions drawn from them was that they utilized data from International Snowmobile Industry Association surveys which were found unreliable after it was determined that it was not known how many snowmobile manufacturers were ISIA members, how many members reported to ISIA, or whether those who did report did so with some degree of accuracy. Since the exclusion of the ISIA reports was proper, the exclusion of the exhibits that graphically displayed the ISIA data was proper.

Plastics argues effectively that there were a number of factors other than the fuel tank problems which depressed the plaintiff's sales in 1969 and 1970 and that plaintiff failed to isolate the losses attributable to the defective tanks. There were lost production hours in August 1965 due to a parts shortage. Some distributors were doing a poor job of selling. A number of machines were recalled in 1969 and 1970 due to defective parts. The plaintiff's parent company, Textron, suffered an 11% decrease in earnings during this period which it blamed on a number of factors in its report to shareholders, including inflation and a recession. It stated: "The inventory of difficulties is long; tight money, high interest rates, declining industrial production, a drop in real gross national product, disruption from national strikes, widespread local work stoppages, soaring costs, rising unemployment, and on and on."

█ We concur in the trial court's conclusion that Polaris did not, and perhaps could not, adequately segregate the losses due to defective tanks from losses due to all of the other variable and imponderable factors which may have accounted for its decline in earnings. We adhere to the rules we adopted and applied in *B & Y Metal Painting, Inc. v. Ball,* 279 N.W.2d 813 (Minn.1979); *Leoni v. Bemis Co., Inc.,* 255 N.W.2d 824 (Minn.1977); and *Miller v. Reiter,* 155 Minn. 110, 192 N.W. 740 (1923). Damages for loss of profits will not be denied merely because of the difficulty of ascertaining them. Nevertheless, we believe the circumstantial evidence in this case does not furnish a reasonable basis on which to determine plaintiff's loss. Consequently we affirm as to the denial of that claim.

*The Fusion Appeal*

█ The issue presented by this appeal is whether Plastics had a right to full indemnity from Fusion as the trial court held, or whether Fusion was entitled to have the jury determine the comparative negligence of Plastics and Fusion and limit Fusion's liability to contribution only. Although we are of the view that the trial court might well have submitted the issue of comparative negligence under other circumstances, in the context of this case it was proper not to do so.

Reconciling the special verdicts applicable to Plastics' liability the court properly held that Plastics was found negligent only as to "information supplied [to Polaris] concerning the polyethylene gasoline tanks."

In *Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362 (Minn.1977) we abrogated Rule 4 set forth in *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 104 N.W.2d 843 (1960) which had granted indemnity where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged. *Tolbert* held that an installer of equipment had a duty to inspect and discover a defect in a component part supplied by a manufacturer, and that failure to do so required a determination of comparative negligence rather than an award of indemnity.

The events which gave rise to this litigation occurred in the years 1968 and 1969, at a time when all of the *Hendrickson* rules were applicable. The rights and duties of manufacturers, suppliers, and consumers as to indemnity were clearly and explicitly defined in *Hendrickson*. Whether or not Plastics in fact relied on that case in transacting business is not before us. They had a right to invoke whatever rule then applied. Had these matters been litigated promptly, or at any time before 1977, Plastics would undoubtedly have had an absolute right to indemnity, unless, of course, this case had been used as a vehicle for rescinding the rule. Where the question is as close as this and where the equities lean as heavily in favor of respondent, it is not inappropriate to accord some weight to the law which was in effect when the cause of action arose.

The manner in which these verdicts were framed and submitted to the jury leaves the court with a murky and complex set of facts to address. Two facts were clear to the trial court, however, and they are equally clear to this court. First, Fusion, "leader in the field for many years", misled Plastics with assurances that its resin had been thoroughly tested and tried without any history of failure; and second, Plastics relied on these assurances to the extent it believed further testing was unnecessary. The trial court in effect characterized Plastics' role as merely a conduit for supplying Polaris with Fusion's misinformation. As we have indicated, we are not entirely free from doubt as to the jury's intention in finding Plastics negligent with respect to supplying Polaris with information. It may be that the jury believed it was Plastics' duty to conduct tests of its own, or the jury may have simply found that Plastics was vicariously liable for conveying Fusion's misinformation. In the latter situation, Plastics would be entitled to indemnity under the first rule in the *Hendrickson* case "[w]here the one seeking indemnity has only a derivative or vicarious liability for the damage caused by the one sought to be charged." *Id.* at 372, 104 N.W.2d at 848. Since the parties did not seek or obtain verdicts which would have made it possible to identify Plastics' negligence as either independent of Fusion's or simply vicarious as to Fusion, we are of the opinion that the trial court's conclusions were not clearly erroneous. Accordingly we affirm its order awarding Plastics full indemnity against Fusion.

Affirmed in part, reversed in part, and remanded.

AMDAHL and SIMONETT, JJ., not having been members of this court at the time of argument and submission, took no part in the consideration or decision of this case.