LeSUEUR CREAMERY, INC., a Minnesota Corporation, Appellee,

v.

HASKON, INC., a Delaware Corporation; Hercules, Inc., a Delaware corporation, Appellants.

No. 80–2003.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1981.

Decided Sept. 17, 1981.

Rehearing and Rehearing En Banc Denied Oct. 26, 1981.

Stephen J. Snyder, argued, Diane Hollern, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for appellants Haskon, Inc. and Hercules Inc.

W. M. Gustafson, argued, Daniel J. Sheran, MacKenzie, Gustafson & Lucas, Ltd., St. Peter, Minn., for appellee LeSueur Creamery, Inc.

Before HEANEY and HENLEY, Circuit Judges, and NICHOL,* Senior District Judge.

HEANEY, Circuit Judge.

LeSueur Creamery, Inc., commenced an action against Haskon, Inc., and Hercules, Inc.,[1] alleging breach of warranty, negligence and misrepresentation with respect to the sale, installation and servicing of pasteurizing equipment. The action was tried to a jury and special interrogatories were submitted by the district court on each of the three theories but with a single damages question. The jury found in favor of LeSueur on each cause of action and awarded it $605,250. It also found that LeSueur was contributorily negligent and twenty-five percent of LeSueur's damages were caused by that negligence. The district court entered judgment in favor of LeSueur for $583,523.65, the amount of the jury verdict less $16,016.58 awarded to Haskon on a counterclaim. Haskon appeals, contending that the award cannot be sustained on any theory, and that if the award can be sustained, the trial court erred in not reducing it by twenty-five percent. While the issues are not free from doubt, we affirm the award on a theory of negligence and reduce it by twenty-five percent to $437,920.92.[2]

## I. *Facts.*

LeSueur operates a cheesemaking plant in LeSueur, Minnesota. Haskon is engaged in the sale and installation of dairy equipment. In October, 1969, LeSueur purchased a used pasteurizer and related equipment (referred to as an HTST in the industry) from Haskon for $5,000. The pasteurizer's function in cheesemaking is to heat milk sufficiently to meet health requirements. Haskon initially installed the HTST with a capacity of 20,000 pounds of milk per hour.

At the time of the original purchase, LeSueur's president, discussed with the Haskon representative, Edward Donohue, its plans for increasing its cheese production and the HTST's capabilities for expansion. Within ninety days of the purchase of the HTST, LeSueur proceeded to implement its plans to expand production. Haskon was

---

* The Honorable Fred J. Nichol, United States Senior District Judge for the District of South Dakota, sitting by designation.

1. Haskon is a wholly-owned subsidiary of Hercules. The trial court found, as a matter of law, that Haskon and Hercules, Inc., "are so closely related in their operation, if not their form, that Hercules, Incorporated should be held jointly liable for the actions of Haskon, Inc." Haskon and Hercules do not appeal from this finding.

2. The jury award of $605,250, less the twenty-five percent for contributory negligence, equals $453,937.50, less the $16,016.58 counterclaim equals $437,920.92.

hired to design a new cheese room and cheese facility to increase LeSueur's production capacity to 35,000 pounds of milk per hour. Haskon also installed the necessary equipment, piping and cheese vats. LeSueur paid Haskon an additional $167,687, exclusive of the vats, for the design, equipment, piping and installation of the cheese room and facility. During this time period, LeSueur's president talked with Donohue several times about expanding the capacity of the HTST to 35,000 pounds per hour. Donohue concedes that he represented that "Haskon could and would expand [the capacity of LeSueur's HTST] to 35,000 pounds per hour."

In January and February, 1971, LeSueur moved its operations into the new cheese room. At that time, Haskon restreamed[3] the HTST to increase its capacity to 26,000 pounds per hour and installed the unit in appellee's new cheese facility. As soon as the HTST was installed, the unit developed temperature control problems. The heat produced by the HTST was both fluctuating and excessive, and the temperature of the milk moving between the HTST and the cheese vat was either too high or too low. From Spring, 1971, to May, 1973, Haskon made several unsuccessful attempts to correct the temperature problems with the HTST. In May, 1973, LeSueur again called in Haskon to restream the HTST to increase its capacity to 35,000 pounds of milk per hour. After this restreaming, the HTST continued to produce excessive heat. Haskon made several additional unsuccessful efforts to correct the temperature problems through June, 1974. In August, 1974, LeSueur brought in John McNamara, a pasteurizer dealer with over twenty years experience to examine the HTST. McNamara made four basic changes in the HTST which solved the temperature problems.

Thereafter, LeSueur commenced this action, contending that the temperature control problems resulted in a loss of cheese yield caused by the effect of excessive heat on the cheese-producing properties of milk.[4] LeSueur sought to recover the value of its lost production as measured by the difference between its projected yield[5] and its actual output during the time period when the HTST installed by Haskon was defective.

The jury found Haskon liable for breach of warranty, negligence and misrepresentation as a result of LeSueur's lost yield. The trial court denied Haskon's motions for a judgment notwithstanding the verdict or, alternatively, for a new trial, and entered judgment against Haskon. Haskon appeals from this judgment. While we have serious reservations as to whether the verdict can be sustained on the implied warranty and misrepresentation counts,[6] it can be affirmed on the negligence theory.[7]

---

3. The HTST is basically a frame which supports thin stainless plates and into which auxiliary equipment is incorporated. The pasteurizer's capacity is determined by the arrangement and number of plates and auxiliary equipment in the unit. Adjusting the arrangement and number of plates in the HTST to modify its capacity is referred to as "restreaming" in the cheese industry.

4. See note 11 infra for a discussion of the adverse effect that excessive heat produced by the HTST has on cheese yield.

5. The projected yield was determined by a mathematical equation, called the Van Slyke and Price formula, used in the cheese industry to estimate production. See infra at 350 for a discussion of the application of the formula in this case.

6. LeSueur contends that its purchase of the pasteurizer from Haskon created implied warranties of merchantability and fitness for a par-

ticular purpose as provided in Minn.Stat. § 336.2–314 and Minn.Stat. § 336.2–315, respectively. No express warranties were alleged. The jury found that the two implied warranties had been created by the transaction and had been breached by Haskon.

The documents of sale for the original purchase of the pasteurizer in 1969 and for the subsequent equipment purchases to expand production in 1971 and 1973 contained warranty disclaimer clauses. The trial court ruled, in effect, that Haskon's disclaimers were invalid as a matter of law. The trial judge's rationale was that if an oral service contract existed, the Uniform Commercial Code's (UCC) implied warranties could arise from such a service agreement, and that Haskon's disclaimers applied only to the sales contract and not to the services agreement.

The trial court was not clear as to whether it concluded that separate sale of goods and sale

7. See note 7 on page 347.

## II. *Negligence.*

Haskon challenges the jury's negligence finding on several grounds. First, it argues that there is insufficient evidence that Haskon committed any specific negligent acts or omissions, or that Haskon's

of service contracts were created, or whether a single contract, with services and goods aspects, existed. If it concluded that separate service and goods contracts were entered into by LeSueur and Haskon, its implied warranty findings were erroneous. The implied warranty provisions of Minn.Stat. §§ 336.2–314, 336.2–315, like all provisions taken from Article 2 of the UCC apply only to the sale of goods, not the sale of services. *Wells v. 10–X Manufacturing Co.*, 609 F.2d 248, 254 (8th Cir. 1979); *Van Sistine v. Tollard*, 95 Wis.2d 678, 291 N.W.2d 636, 639 (1980). Therefore, if LeSueur's warranty claim is based on a separate oral service agreement between the parties, Minn.Stat. §§ 336.2–314, 336.2–315 are inapplicable and the appellee cannot claim that those statutory implied warranties were created by the transactions between Haskon and LeSueur. *Wells v. 10–X Manufacturing Co., supra*, 609 F.2d at 254; *Lewis v. Big Powderhorn Mountain Ski Corp.*, 69 Mich.App. 437, 245 N.W.2d 81, 82 (1976).

But, if the trial court concluded that a mixed goods and services contract existed, its implied warranty findings may not have been erroneous. The trial court's ruling was based on *O'Laughlin v. Minnesota Natural Gas Co.*, 253 N.W.2d 826, 830–831 (Minn.1977); *Kopet v. Klein*, 275 Minn. 525, 530, 148 N.W.2d 384, 390 (1967), in which the Minnesota Supreme Court held that where installation or some similar service is related to the sale of goods, the implied warranties of the UCC cover the service as well as the goods. In *O'Laughlin* and *Kopet*, the Minnesota Supreme Court emphasized that implied warranties are favored under Minnesota law and did not discuss whether the sale of goods or installation was the most important aspect of the contracts. LeSueur argues that these cases suggest that Minnesota's implied warranty provision apply to all mixed sales of goods and services contracts.

This interpretation of the UCC would be contrary to the generally accepted rule that when a contract involves both the sale of goods and rendition of services, the test for whether the UCC's implied warranty and disclaimer provisions, UCC §§ 2–314 to 2–316, are applicable is whether the goods or services aspect predominates. *E. g., Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974); *Air Heaters, Inc. v. Johnson Electric, Inc.*, 258 N.W.2d 649, 652 (N.D. 1977); Annot. 5 A.L.R.4th 501, 506 (1981). On one hand, if the predominant aspect of the contract is the rendition of services, the UCC implied warranty and disclaimer provisions do not apply to the transaction. On the other hand, if the predominant aspect of the contract is the sale of goods, the UCC implied warranty and disclaimer provisions apply to the transaction.

While the Minnesota Supreme Court apparently liberally construed the UCC implied warranty provisions in *O'Laughlin* and *Kopet*, it did not expressly reject the prevailing "predominant aspect" test for determining whether such mixed sales contracts create implied warranties. Because we hold that the jury's damage award can be sustained on LeSueur's negligence claim, we need not determine whether the district court correctly construed Minnesota's warranty statutes.

We reach the same conclusion on the appellee's misrepresentation cause of action. Under the out-of-pocket loss rule adopted by Minnesota for misrepresentation claims, a plaintiff can only recover what he has actually lost and not the expected profits from the transaction. *General Corp. v. General Motors Corp.*, 184 F.Supp. 231, 240 (D.Minn.1960). Thus, Haskon argues that LeSueur is seeking to recover loss profits which cannot be recovered in a misrepresentation action. The Minnesota Supreme Court, however, has recognized exceptions to the out-of-pocket loss rule on a case-by-case basis. The court has permitted the plaintiffs to recover consequential economic damages when the recovery of out-of-pocket expenditures will not return the injured party to a status quo ante position. *E. g., Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 200, 235 N.W.2d 831, 835 (1975); *Strouth v. Wilkison*, 302 Minn. 297, 300, 224 N.W.2d 511, 514 (1974).

We believe that LeSueur's claim is not solely for lost profits. *See* note 11 *infra* and accompanying text. But because of the nature of the damage to LeSueur's property from the excessive heat treatment, appellee's actual property damage cannot be precisely computed and separated from its claim for lost profits. Thus, LeSueur's measure of recovery for lost yield is in form a lost profits formula but, in effect, it is a claim for both lost profits and property damage. Under these circumstances, whether a Minnesota court would apply the general out-of-pocket loss rule or the exception is an open question. Without discussing this issue, the trial court denied Haskon's request for a jury instruction stating that LeSueur could not recover lost profits in a misrepresentation action. Because LeSueur is entitled to recover on its negligence theory, we need not decide whether the jury's damage award can be sustained on a misrepresentation theory on the instant facts.

7. We need only find that LeSueur is entitled to recover on one of its claims to sustain the verdict. *E. g., Zirinsky v. Sheehan*, 413 F.2d 481, 486 (8th Cir. 1969), *cert. denied*, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970). Haskon, citing *Arnott v. American Oil Co.*, 609 F.2d 873, 889 (8th Cir. 1979), *cert. denied*, 446 U.S.

conduct caused the appellee's loss. We do not agree. An appellate court cannot freely substitute its judgment for that of the jury. A jury's finding of negligence will be overturned for insufficient evidence—if at all—only where the verdict is clearly contrary to the evidence. *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973); Wright & Miller, Federal Practice and Procedure: Civil § 2819 (1971). *See Minnesota Mutual Life Insurance Co. v. Wright*, 312 F.2d 655, 659–660 (8th Cir. 1963). The jury's decision was not manifestly incorrect in this case. While Haskon correctly observes that other factors—including inexperienced management, personnel turnover, and equipment and servicing obtained from companies other than the appellant—might have contributed to the reduction in yield, sufficient evidence was introduced for the jury to reasonably conclude that Haskon's negligent installation and servicing of the pasteurizer was the primary cause of LeSueur's loss.

Haskon designed, installed and twice restreamed the HTST. After the pasteurizer was restreamed, it developed temperature problems resulting in lost yield which Haskon could not correct despite repeated efforts and which ended only after John McNamara made four adjustments in August, 1974. Haskon's expert witness conceded that any of the four parts changed by McNamara could have caused the excessive

heat problem in the pasteurizer. Finally, through its own expert, LeSueur introduced evidence that its actual cheese yield was further below its projected yield during the defective period than after the HTST was adjusted in August, 1974. From this evidence, the jury could have rationally concluded that Haskon negligently caused LeSueur's loss of cheese yield.

■ Haskon also argues that the trial judge instructed the jury as to the wrong standard of care. It contends that the trial court should have used the reasonable person charge rather than hold the appellant to a higher standard of care for professionals.[8] We disagree. Professional persons *and* those engaged in any work or trade requiring special skill must possess a minimum of special knowledge and ability as well as exercise reasonable care. *E. g., City of Mounds View v. Walijarvi*, 263 N.W.2d 420, 424 (Minn.1978); *City of Eveleth v. Ruble*, 302 Minn. 249, 253–255, 225 N.W.2d 521, 524–525 (1974); Prosser, Law of Torts § 32 at 161–162 (4th Ed. 1971). The evidence adduced at trial that installing and modifying the HTST required special skill and knowledge was sufficient to justify the trial court's instruction.[9]

■ Finally, Haskon contends that LeSueur's claim is solely for lost profits and that such economic losses are not recovera-

918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), argues that a new trial must be ordered unless the damage award can be separately sustained under each of LeSueur's theories. This argument misperceives our disposition of the damages issue in *Arnott.* In that case, the jury found the defendant liable for misrepresentation, breach of fiduciary duty and violation of antitrust laws. *Id.* at 888. Because a single damages question was submitted to the jury for all three claims, this Court held that the $100,-000 actual damage award could not be trebled because it would be speculative to assume the entire award was for the antitrust violations. *Id.* at 889. But the *Arnott* Court went on to state that since the evidence supported the actual damage award "on any of the three counts," it would not be set aside. *Id.* at 889. Thus, the *Arnott* Court did not find that to be awarded damages in a multiple claim case, a

plaintiff must prove that he was entitled to recover on each of his causes of action.

8. The trial court's instruction to the jury on the applicable standard of care owed by the appellant was:

One who undertakes to render professional or technical services is under a duty to the person for whom the service is performed to exercise such care, skill and diligence of men in that profession or technical service ordinarily exercised under like circumstances.

9. Haskon further argues that under Minnesota law, it cannot be subject to both a professional standard of care in a negligence action and a claim for breach of implied warranty. Because we hold that LeSueur cannot recover on its implied warranty claim, we need not address this argument.

ble in negligence in the absence of property damage or personal injury. The Minnesota Supreme Court has not yet specifically addressed the issue of whether economic loss unaccompanied by personal injury or property damage can be recovered in a negligence action. The court recently suggested in dicta that it may permit loss profits to be recovered in tort even in the absence of personal injury or property damage.[10]. *Allied Aviation Fueling Company of Minnesota v. Dover Corp.*, 287 N.W.2d 657, 659 (Minn.1980). But even if the Minnesota Supreme Court follows the majority position that purely economic losses are not recoverable in tort, Haskon's argument fails because the appellee's claim is not based solely on lost profits. LeSueur also suffered property damage to its milk. The excessive heat denatured the whey proteins in the milk and reduced the solubility of the ionic calcium in the milk and this damage decreased LeSueur's cheese yield.[11]

■ LeSueur argues that the property damage it has suffered can be measured by the difference between the volume of the cheese as produced by the defective HTST and the volume of the cheese that would have been produced if the pasteurizer was operating properly, with the difference being measured by market value. Although Haskon properly argues that this measure is in form a lost profits measure, on the instant facts, it is a satisfactory method of calculating property damage because of the special nature of the harm to LeSueur's

milk. *See Monsanto Co. v. Thrasher*, 463 S.W.2d 25, 27 (Tex.1970) (Property damage to plaintiff's corn crop caused by failure of defendant's herbicide to control weeds measured by "the difference between the value of the crop as produced with the weeds and the crop that would have been produced had the herbicide controlled as represented.").

■ Property damage, including damage to the defective property itself and to other property as a result of the defect, is recoverable in negligence. *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 123–124, 211 N.W.2d 159, 165 (1973); Prosser, Law of Torts, § 101 at 665 (4th ed. 1971). Moreover, to the extent that some of LeSueur's claim is for lost profits in addition to property damage, a negligence action can be maintained for economic loss when personal injury or property damage are also present. *E. g., Duchene v. Wolstan*, 258 N.W.2d 601, 606 (Minn.1977); *Northern Petrochemical Co. v. Thorsen & Thorsov, Inc., supra*, 297 Minn. at 123–124, 211 N.W.2d at 166.

Hence, each of Haskon's challenges to LeSueur's negligence action must be rejected and the judgment based on this theory is affirmed.

### III. *Damages.*

■ Although damages must not be speculative or conjectural, the law does not require mathematical precision in proof of loss—proof to a reasonable certainty is suf-

---

10. A number of states have held that purely economic loss can be recovered in tort. *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 182 N.W.2d 800 (1970); *Lang v. General Motors Corp.*, 136 N.W.2d 805 (N.D.1965); *Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88, 326 N.E.2d 267 (1975); *Berg v. General Motors Corp.*, 87 Wash.2d 584, 555 P.2d 818 (1976); *City of LaCrosse v. Schubert, Schroeder & Associates, Inc.*, 72 Wis.2d 38, 240 N.W.2d 124 (1976). The majority of courts to consider the issue, however, have held that claims for purely economic losses cannot be premised on tort theories. *E. g., Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 287 & n.13 (3d Cir. 1980); *J. M. Wilson & Co. v. Smith International, Inc.*, 587 F.2d 1363, 1376 (9th Cir. 1978).

11. Milk has two groups of proteins: caseins and whey. The structure of cheese is made up of casein proteins. Excessive heat treatment of the milk in the HTST denatures the whey proteins. The result of this denaturization is that the whey combines with the caseins and interferes with the caseins' capacity to form into a strong curd structure. In addition, excessive heat treatment also makes the ionic calcium in the milk less soluble which also weakens the curd structure. The weaker the curd structure, the less cheese solids and more whey that is produced. The cheese solids move from the HTST to the cheese vats and eventually are turned into marketable cheese. Whey is the by-product of the process. Therefore, the ultimate result of excessively heating the milk in the HTST is lost cheese yield.

ficient. *E. g., Duchene v. Wolstan, supra.* We conclude that LeSueur has established its lost yield with sufficient certainty to sustain the jury's damage award on a theory of negligence. Because we are sustaining the jury's damage award only on the negligence theory, we need not reach Haskon's damages arguments regarding LeSueur's warranty and misrepresentation claims.

LeSueur relied on a mathematical formula, called the Van Slyke and Price formula, to calculate its lost yield. The Van Slyke formula projects the ideal cheese yield that can be produced from a certain quantity of milk at a given butter fat percentage with a given casein content. LeSueur computed its lost yield by comparing its actual yield with the Van Slyke projected output from May, 1971, to August, 1974, the period when LeSueur was experiencing the temperature control defects with the pasteurizer. To determine the dollar value of its lost yield, LeSueur calculated the number of pounds of cheese that actual yield fell below the projected yield for each during the defective period and multiplied these monthly figures by the prevailing market price for the corresponding month.

Under the circumstances of this case, the Van Slyke formula was a reasonably accurate method of computing the appellee's damages. The Van Slyke formula is in general use in the cheese industry, by both academicians and producers. More-

over, we believe that LeSueur introduced evidence adequately demonstrating that its actual yield generally reached or was sufficiently close to its projected yield after the HTST was fixed to justify calculating damages during the defective period by comparing actual yield to projected yield.

During the defective period from May, 1971, to August, 1974, the weighted average of LeSueur's shortfall of actual yield below projected yield was approximately 2.90 percent per month.[12] After the excessive heat problem was eliminated by John McNamara in August, 1974, the weighted monthly average of LeSueur's shortfall for September, 1974, through December, 1977, was only .25 percent.

Haskon points out that for thirteen consecutive months following August, 1974, LeSueur failed to achieve its projected yield. LeSueur, however, performed better during the last four months of 1974 after the pasteurizer was fixed than it did for the first part of that year. Haskon is correct that during the first nine months of 1975, LeSueur's actual monthly yields sometimes were further below its projected yield than the monthly shortfalls during the defective period. But Professor Howard Morris of the University of Minnesota, along with LeSueur's president Mark Davis, testified that the Minnesota cheese industry in general failed to meet the Van Slyke projected yields in approximately the first half of 1975.[13]

---

**12.** The weighted monthly average of LeSueur's shortfall during the periods from May, 1971, through August, 1974, and from September, 1974, through December, 1977, was calculated by dividing the sum of the monthly differences between projected and actual yield (measured in pounds produced) by the sum of the monthly projected yields.

**13.** Dr. Howard Morris, an expert in cheese production from the University of Minnesota, testified on cross-examination as follows:

> Q  Do you have, based upon your knowledge of the cheese industry in Minnesota, any explanation of or account for the drop in yield in the spring of 1975?
> [Morris] A  I know that Land O'Lakes and Mid-America Dairymen also experienced a drop in yield the first quarter of 1975. I have got records that show that. We don't

actually know why or the number of causes that could come forth.

> Q  There is no scientific explanation for the cause?
> A  No, I don't know.
>
> \*  \*  \*  \*  \*  \*
>
> Q  I would like to have you assume, if you would, sir, that for the months of September 1974 and continuing through for a full year, including the month of September of 1975, and in each and every one of those 13 months that LeSeuer [sic] Creamery's actual yield at 37 percent moisture was below, and in some cases considerably below the calculated yield at 37 percent moisture, would you then be of an opinion as to whether or not the equipment at LeSeuer [sic] Creamery was operating properly at that time?
> A  Yes, I would. I could explain.

Finally, from October, 1975, through December, 1977, LeSueur attained or exceeded its projected yield eighteen out of the twenty-seven months. During the defective period from May, 1971, to August, 1974, LeSueur attained or exceeded its projected yield only three months out of thirty. Moreover, the shortfall of actual output from projected yield during those nine months in 1975 to 1977 was significantly less than the shortfall for most of the months during the defective period.

■ This evidence is sufficient to demonstrate that LeSueur suffered reduced cheese yield. Once the fact of loss has been proven, the difficulty of proving the amount will not preclude recovery as long as there is a reasonable basis to approximate the amount. *Polaris Industries v. Plastics, Inc.*, 299 N.W.2d 414, 419 (Minn. 1980); *Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824, 826 (Minn.1977). LeSueur's evidence provides such a reasonable basis to calculate LeSueur's loss.

■ Haskon asserts that even if LeSueur has shown that it was damaged, the appellee has not established that the appellant has caused the loss. Haskon argues that under *Polaris Industries v. Plastics, Inc., supra*, 299 N.W.2d at 418–419, a plaintiff must segregate its lost yield due to the defective product from losses caused by other factors in order to recover from the seller of the defective goods. Haskon's reliance on *Polaris Industries* is misplaced. There, the Minnesota Supreme Court did not rule that a plaintiff must always segregate the sources of its damages in order to recover lost profits. Rather, it held that lost profits were not recoverable because "the circumstantial evidence * * * does not furnish a reasonable basis on which to determine plaintiff's loss." *Id.* at 419. In *Polaris Industries*, there was very little evidence that the defective gas tanks supplied by the defendant caused the plaintiff's reduced

sales of snowmobiles. The plaintiff's most important evidence—data showing that it sustained losses during years the industry was generally doing an increased volume of business—was excluded from trial for lack of foundation. And the defendant introduced evidence that a plethora of other factors could have caused the lost profits. Contrastingly, here LeSueur's evidence was sufficient to raise a reasonable inference that its lost profits were caused by Haskon. Under *B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 817 (Minn.1979), once LeSueur raised a reasonable inference as to the amount of damages caused by the appellant, Haskon "is liable for such amount unless evidence is presented to rebut the inference and establish that the loss was caused by [other] factors." Haskon speculates at length about other factors that may have caused LeSueur's lost yield, but it did not introduce sufficient evidence for us to overturn the jury's verdict and hold that, as a matter of law, the appellant has rebutted the inference of causation or established that the damage was caused by other factors.

Haskon also argues that the jury's negligence verdict must be set aside because the trial court refused to admit into evidence LeSueur's income tax returns. The appellant contends that these tax returns show that LeSueur made a greater profit during the period when the pasteurizer was allegedly defective than it ever made before or after. Haskon argues, of course, that this evidence effectively would have rebutted LeSueur's claim that it suffered any loss from May, 1971, until August, 1974, as a result of the HTST's defective operation.

■ We agree that the appellee's tax returns for the time period when the pasteurizer was defective are relevant to the issue of whether LeSueur lost any profits. We cannot agree, however, that the failure to admit the returns was such a clear abuse

Q  And what would your opinion be?
A  There are many reasons or causes for yields to vary. * * * One of the major ones in my opinion is heat damage, and it appeared to me that during this time, it's my opinion that during this time that the heat damage that was going on, that the causes of the yield differences were because of heat damage.

of discretion as to constitute reversible error. *See Control Data Corp. v. International Business Machines Corp.*, 421 F.2d 323, 326 (8th Cir. 1970).

The overriding issue in this case is not whether LeSueur made any profit during the years in controversy, but rather whether LeSueur would have made a larger profit but for the actions of Haskon. Hence, the probative value of the tax returns is not great. Furthermore, the appellee's tax returns showing that LeSueur made a profit when the pasteurizer was defective may well have misled or confused the jury and prejudiced LeSueur. Therefore, under Rule 403 of the Federal Rules of Evidence, the tax returns could be properly excluded.[14]

Finally, Haskon contends that the damages awarded for negligence must be limited to $5,000, the purchase price of the pasteurizer, because the purchase and shipping orders for the equipment contained the following limitation of liability provision:

Liability of the seller, if any hereunder, shall in no event exceed in amount the purchase price of the materials sold with respect to any damages which are claimed.

■ In Minnesota, parties can by contract, without violating public policy, limit their liability for their own negligence. *E. g., Great Northern Oil Co. v. St. Paul Fire and Marine Insurance Co.*, 291 Minn. 97, 100, 189 N.W.2d 404, 407 (1971); *Independent School District No. 877 v. Loberg Plumbing & Heating Co.*, 266 Minn. 426, 434, 123 N.W.2d 793, 798–799 (1963). The exculpatory provision need not expressly mention negligence; the only requirement is that it evince the parties' intention to limit liability for negligent conduct. *Great Northern Oil Co. v. St. Paul Fire and Marine Insurance Co., supra*, 291 Minn. at 100,

189 N.W.2d at 407; *Independent School District No. 877 v. Loberg Plumbing & Heating Co., supra*, 266 Minn. at 434, 123 N.W.2d at 799.

■ Here, the trial judge refused to give Haskon's requested instructions on the effect of the limitation of remedy provision in the sales documents.[15] The basis for his refusal was his decision, in effect, that as a matter of law, if an oral services contract existed between the parties, the limitation of remedy provision in the sales documents applied only to the pasteurizer and related equipment and not to the services agreement. Under these circumstances, the trial court should have submitted to the jury the question of whether the parties had agreed to an oral services contract. *Bergstedt, Wahlberg, Berquist Associates, Inc. v. Rothchild*, 302 Minn. 476, 479–480, 225 N.W.2d 261, 263 (1975). His failure to do so, however, is not reversible error.

■ The trial judge utilized a special verdict form in which the following question was asked:

Did the defendant impliedly warrant the merchantibility [sic] of servicing the pasteurizing unit and related equipment?

Under the Uniform Commercial Code, an implied warranty of merchantability arises by operation of law when a purchaser and merchant enter into a contract unless the warranty is effectively disclaimed. *Moosbrugger v. McGraw-Edison Co.*, 284 Minn. 143, 157, 170 N.W.2d 72, 80 (1969); White & Summers, Uniform Commercial Code § 9–6 at 343–344 (2d Ed. 1980). Therefore, by finding that Haskon had impliedly warranted the merchantability of the servicing of the HTST, the jury, in effect, found that there was a service contract between Haskon and LeSueur.

---

**14.** Rule 403 of the Federal Rules of Evidence provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**15.** Shipping and purchase orders accompanied the original sale of the pasteurizer in 1969, and the sales of related equipment in January, 1970, and March, 1972, for the two subsequent expansions of the HTST. Each sales document contained the identical limitation of remedy provision.

The jury's determination that the parties entered into a services contract must be sustained. A jury finding will not be overturned for insufficient evidence unless it is clearly contrary to the evidence. *Urti v. Transport Commercial Corp., supra,* 479 F.2d at 769; Wright & Miller, Federal Practice and Procedure: Civil § 2819. *See Minnesota Mutual Life Insurance Co. v. Wright, supra,* 312 F.2d at 659–660. Haskon's argument that the jury's finding that a services agreement existed is not supported by the evidence fails to meet the strict standard for overturning a jury's factual determinations. The appellee introduced evidence that Haskon's sales representative told LeSueur's president that Haskon could, and would, expand the capacity of LeSueur's HTST to handle the appellee's proposed increase in production to 35,000 pounds of milk per hour. Additionally, Haskon designed appellant's new cheese room and facility, and installed the necessary equipment and piping. Moreover, in 1971 and 1973, Haskon in fact did restream LeSueur's pasteurizer to increase its capacity ultimately to 35,000 pounds of milk per hour. Finally, the appellant made numerous changes in the HTST between January, 1971, and June, 1974, in an effort to resolve the temperature problems with the pasteurizer. From this evidence, the jury could have rationally concluded that the parties entered into an oral contract pursuant to which Haskon would install and service LeSueur's HTST.

In addition, the appellant's objection that LeSueur's evidence of an oral service agreement violated the parol evidence rule is waived and cannot be asserted because it is raised for the first time on this appeal. *Sartin v. Commissioner of Public Safety of State of Minnesota,* 535 F.2d 430, 433 (8th Cir. 1976).

Finally, the trial court's refusal to give Haskon's requested instruction regarding the limitation of remedy provision does not constitute reversible error. Haskon introduced no evidence that the parties intended to limit the appellant's liability for negligently servicing the pasteurizer other than the sales documents for the pasteurizer and related equipment containing the limitation of remedy clause. On that evidence, it was not clearly erroneous to conclude, as a matter of law, that if an oral service agreement existed, the parties did not intend to limit Haskon's liability for negligent service.

Since the parties did not evince an intent to limit Haskon's liability, LeSueur's recovery is not limited to the purchase price of the pasteurizer. *Great Northern Oil Co. v. St. Paul Fire and Marine Insurance Co., supra,* 291 Minn. at 100, 189 N.W.2d at 407; *Independent School District No. 877 v. Loberg Plumbing & Heating Co., supra,* 266 Minn. at 434, 123 N.W.2d at 799.

IV. *Contributory Negligence.*

The Minnesota comparative fault statute governing in this case requires that in actions involving negligence "any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person recovering." Minn.Stat. § 604.01 (1969).[16] Here, the jury found that LeSueur's own negligence caused twenty-five percent of its loss. Nevertheless, the trial court entered judgment in favor of LeSueur for the entire $605,250 jury award without a reduction for the appellee's own negligence.

The trial judge refused to reduce the damage award because he concluded that "the jury has already reduced the verdict to reflect the plaintiff's negligence or failure to mitigate. A further reduction is neither proper nor required by the comparative fault statute." The trial judge reached this conclusion because $807,000, the amount of loss claimed by LeSueur, reduced by twenty-five percent, equals the jury award of $605,250.

---

16. The 1969 version of the statute was amended in 1978 to cover actions in addition to negligence, and contributory "fault" was substituted for "negligence" as the basis for reducing damage awards. Minn.Stat. §§ 604.01, 604.01, 1a (1978).

The trial court's refusal to reduce the damages awarded in proportion to LeSueur's own negligence was erroneous. Minnesota law explicitly requires that a jury's damage award be proportionally reduced by the amount of negligence attributable to the prevailing party. It was pure speculation by the trial judge to conclude that the jury had already reduced its verdict to reflect LeSueur's negligence. The jury may just as well have found that the appellee had only proven $605,250 in losses. The trial judge is not free to speculate as to the reasons for the jury's verdict, *see Arnott v. American Oil Co.*, 609 F.2d 873, 889 (8th Cir. 1979); he must apply the statute and reduce the damages awarded in proportion to the prevailing party's own fault. *See* Woods, *The Negligence Case: Comparative Fault* (1978) § 20:3 at 384–385. Neither the trial court or LeSueur offer any support for any other construction of Minnesota's comparative fault statute. Therefore, the jury's $605,250 damage must be reduced by twenty-five percent—to $453,937.50—to reflect the amount of LeSueur's loss attributable to its own negligence, less the $16,016.58 counterclaim.

The judgment, as modified, is affirmed.