**BLAINE ECONOMIC DEVELOPMENT AUTHORITY, Appellant,**

v.

**ROYAL ELECTRIC CO., INC., Respondent.**

No. C5-93-2505.

Court of Appeals of Minnesota.

Aug. 16, 1994.

Paul T. Ostrow, Sweeney, Borer & Ostrow, St. Paul, for appellant.

Larry Neilson, Rooney & Neilson, Ltd., Arden Hills, for respondent.

Considered and decided by PARKER, P.J., and CRIPPEN and PETERSON, JJ.

PETERSON, Judge.

Appellant Blaine Economic Development Authority (Blaine E.D.A.) sued respondent Royal Electric Co., Inc. (Royal) for breach of a construction contract. Royal counterclaimed for wrongful termination of the contract and damages. The district court granted partial summary judgment in favor of Royal on the issue of liability for wrongful termination of the contract. Following trial on the issue of damages, the district court awarded Royal $36,235, which included $21,656 for lost profits. Blaine E.D.A. appeals the grant of partial summary judgment and the award of lost profits. We affirm.

## FACTS

Blaine E.D.A. and Royal entered into a construction contract. Under the contract, Royal agreed to act as the electrical contrac-

tor for the construction of the Blaine Senior Housing Project. The contract contained the following termination provision:

[I]f the Contractor persistently or repeatedly refuses or fails, except in cases for which extension of time is provided, to supply enough properly skilled workers or proper materials, * * * or otherwise is guilty of a substantial violation of a provision of the Contract Documents, and fails within seven days after receipt of written notice to commence and continue correction of such default, neglect or violation with diligence and promptness, the Owner * * * may, after seven days following receipt by the Contractor of an additional written notice * * * terminate the employment of the Contractor and take possession of the site and of all materials, equipment, tools, construction equipment and machinery thereon owned by the Contractor and may finish the Work by whatever methods the Owner may deem expedient.

In November 1990, Royal began performing electrical work. A number of disagreements arose between Royal and Blaine E.D.A. relating to Royal's performance under the contract. On January 25, 1991, the project manager sent Michael Gannucci, Royal's president, the following letter:

This letter is to serve as notice that you, Mike Gannucci of Royal Electric, are required to attend a meeting on Tuesday, January 29, 1991 at 11:00 A.M. at the City Hall in Blaine.

Discussion will be held regarding the continuous conflict between Royal Electric and the contract/scheduling delays. These problems are jeopardizing your contract on this project.

Your failure to attend this meeting will only support the existing problems we're experiencing with your company.

At the meeting on January 29, 1991, Gannucci received the following written agenda:

BLAINE COURT/ROYAL ELECTRIC
AGENDA
1/29/91—11:00 a.m.

PRESENT: Mike Gannucci
Sharon Witt
Arden Holzheimer
John Kaiser
Doug Moe

I. Royal Electric Daily Progress Schedule
   A. John to read outline schedule
II. Temp Power & Lights
   A. 12/10/90 – Arden requested temp outlet
   B. 12/17/90 – Power outlet & temp light requested
   C. 12/28/90 – Power outlet & temp light requested
   D. 1/2/91 – Mike of Royal meet at the City hall and stated he would install immediately the temp lights as per specs
   E. 1/4/91 – One man installed lights, but not as per specs
   F. 1/16/91 – In writing, Arden requested temp power & lights (As of 1/25/91 the 2nd & 3rd floor were not done)
III. Construction Schedule
   A. Engineered Shops
      1) 11/9/90 – signed contract sent to Royal
      2) 1/3/91 – Mike showed the City a preliminary shop for the purpose of temp lighting & outlet location only.
      3) 1/8/91 – Mike & Al (low voltage rep) did not show up at a scheduled City meeting.
      4) 1/25/91 – Royal still did not have the final shops to R.A. Morton, Doug Moe, or the City.
      5) 12/13/90 – Received mechanical shops.
   B. Man Power
      1) 12/27/90 – Ready for electric (mechanical started)
      2) 12/27/90 thru 1/25/91–one man alone worked a total of 7 days.
      3) Construction Schedule

IV.   Change Orders
    A.   Corridor Lights
    B.   Exterior Lights
    C.   Upcoming (sub out)
V.   Contract
    A.   Signed contract (Royal/Blaine)
    B.   Bond
VI.   Misc.

On February 1, 1991, at Gannucci's request, Donald Poss, Blaine E.D.A.'s executive director, met with Gannucci to discuss the possibility of mutual termination of the contract. At both the January 29, 1991 meeting and the February 1, 1991 meeting, Gannucci made statements to the effect that he was losing money on the project.

On February 5, 1991, Royal received a stop work order and a notice of intent to terminate contract from Blaine E.D.A. Pursuant to the stop work order, Royal left the job site. Blaine E.D.A. then hired J.T. Electric to complete electrical work on the project.

Blaine E.D.A. sued Royal for breach of contract. Royal counterclaimed, alleging that Blaine E.D.A. breached the contract. Royal brought a motion for partial summary judgment, asking the court to find that Blaine E.D.A. had wrongfully terminated the contract. The district court granted Royal's motion, holding that Blaine E.D.A. wrongfully terminated the contract by not providing Royal with a written "notice to cure" seven days prior to the stop work order.

The issue of damages suffered by Royal due to Blaine E.D.A.'s wrongful termination of the contract was tried to the court. The district court awarded Royal $36,235 in damages, including $21,656 for lost profits.

## ISSUES

1. Did Blaine E.D.A. give Royal the required written notice to cure before terminating the contract?

2. Did the district court properly determine the amount of Royal's damages?

## ANALYSIS

1. Liability

■ On appeal from summary judgment, this court must determine: whether there are any genuine issues of material fact and whether the district court erred in applying the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988).

■ In granting partial summary judgment on the issue of liability, the district court held that Blaine E.D.A. wrongfully terminated the contract by not providing Royal with a written notice to cure pursuant to the contract's termination provision. We agree.

> A provision in a contract for the termination thereof upon certain conditions can be enforced only in strict compliance with the terms of those conditions. * * * The contract cannot be arbitrarily terminated.

*Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc.*, 268 Minn. 176, 187, 128 N.W.2d 334, 343 (1964) (alteration in original) (quoting *McWithy v. Heart River Sch. Dist.*, 75 N.D. 744, 32 N.W.2d 886, 889 (1948)).

> A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

Restatement (Second) of Contracts § 226 (1981).

> An event may be made a condition either by the agreement of the parties or by a term supplied by the court.

*Id.* at 226.

Under the contract's termination provision, providing written notice is an express condition of Blaine E.D.A.'s right to terminate the contract. Royal is required to "commence and continue correction" of its inadequate performance only "after receipt of written

notice." Blaine E.D.A. had no right to terminate the contract before Royal was given seven days to correct its performance and failed to do so, and Royal had no duty to correct its performance until it received written notice from Blaine E.D.A. The termination provision, however, does not describe what must be included in the written notice.

Blaine E.D.A. argues that the January 25, 1991 letter and the January 29, 1991 agenda provided sufficient notice to cure and together constituted the initial written notice required to terminate the contract. We disagree. The letter and agenda did no more than describe problems that occurred before the January 29, 1991 meeting and state that these problems were jeopardizing Royal's contract. They did not direct Royal to do anything.

The contract does not state that the written notice must warn the contractor of the consequences of failing to correct the inadequate performance, nor does the contract require that the written notice expressly state that the inadequate performance must be corrected within seven days. But this does not mean that a written notice need not inform Royal that it must correct its inadequate performance promptly or the contract will be terminated.

Under Blaine E.D.A.'s argument, any document that describes inadequate performance is a sufficient written notice to satisfy the contract termination provision. This argument fails to recognize that, under a typical construction contract, work may be done over an extended period of time. An owner could be dissatisfied with a contractor's performance on part of a project, and notify the contractor of this dissatisfaction, without requiring that correction efforts begin right away. The owner may only require that the correction occur by the time work on the project is complete.

■ Under the contract's termination provision, receipt of the first written notice triggers Royal's obligation to commence and continue correction of inadequate performance identified by the notice. If Royal fails to commence and continue correction within seven days, notice of termination may be delivered. We, therefore, interpret the ter-

mination provision to include the condition that Blaine E.D.A.'s written notice to cure must describe the inadequate performance and must fairly advise Royal that Blaine E.D.A. considers the inadequate performance serious enough that, without prompt correction, the contract will be terminated.

■ We agree with the district court's conclusion:

> Giving all benefit of the doubt to [Blaine E.D.A.] with regards to any notice provided by the letter and agenda * * *, it is clear that there were multiple problems with [Royal's] performance under the contract. It is also obvious from the record that [Royal] was notified and was aware of [Blaine E.D.A.'s] dissatisfaction with its performance. There is no way, however, that these documents constitute a clear notice to cure the defects or lose the contract.

2. Damage Award

On appeal from a judgment, this court's scope of review is limited to deciding whether the trial court's findings are clearly erroneous and whether it erred in its legal conclusions. When the trial court's findings are reasonably supported by the evidence, they are not clearly erroneous and must be affirmed.

*Citizens State Bank v. Leth,* 450 N.W.2d 923, 925 (Minn.App.1990) (citations omitted).

> In construction contracts, if the work has commenced and the buyer breaches, the contractor is entitled to the unpaid contract price less the amount it would have cost him to complete his performance.

*Zobel & Dahl Constr. v. Crotty,* 356 N.W.2d 42, 46 (Minn.1984). In this case, Royal commenced work and Blaine E.D.A. breached the contract. Therefore, under the measure of damages for construction contracts, Royal is entitled to the unpaid contract price less the amount it would have cost Royal to complete the contract. Blaine E.D.A. argues that the district court improperly determined Royal's lost profits.

■ The district court awarded Royal $38,003[1] in damages, which it calculated as follows:

| | | |
|---|---|---:|
| | Reasonably expected profit | $21,656 |
| + | Expenses already incurred | 39,732 |
| − | Progress payments made | 23,385 |
| | Total | $38,003 |

At first glance, it appears that the district court did not use the proper measure of damages. A careful examination of this calculation, however, reveals that it is simply an alternative way to calculate damages using the proper measure of damages. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.20(1), at 454–56 (1993) (explaining alternate calculations of contractor's expectancy damages).

When work on a construction contract has commenced, a contractor's expenses under the contract can be divided into two categories: expenses already incurred and costs of completion. Adding profit to these two categories of expenses determines the contract price. This equation can be stated algebraically as follows:

$$\text{Expenses already incurred} + \text{Costs of completion} + \text{Profit} = \text{Contract Price}$$

When a contractor has received no payments, to calculate damages using the method described in *Crotty,* costs of completion are subtracted from the contract price.

$$\text{Contract Price} - \text{Costs of completion} = \text{Damages}$$

Applying basic mathematic principles to these two equations reveals that the amount of damages calculated by subtracting costs of completion from the contract price will equal the amount of damages calculated by adding expenses already incurred to reasonably expected profit. Either method of calculation yields the same result. To calculate damages, it is necessary to determine either the contract price and the costs of completion or the reasonably expected profit and the costs already incurred. The parties did not dispute the contract price or the amount of costs already incurred. Therefore, it was necessary for the district court to determine either the costs of completion or the reason-

ably expected profit. The district court explained:

Even though the Court did not explicitly use a cost-to-complete figure in its measure of damages, the Court implicitly questions the reliability of Gannucci's cost-to-complete estimate. We find Royal's estimate to be under-stated. In the Court's measure of damages, there is, implicitly, a figure for the cost-to-complete the project.

■ There was evidence that Gannucci said to the construction manager and to the executive director of Blaine E.D.A. that he was going to lose money on this job. Although Gannucci denied making these statements, the district court acknowledged in its findings that the admissions by Gannucci were "significant admissions." Blaine E.D.A. argues that if the court accepted these admissions as accurate, the district court's finding that Royal incurred damages for lost profits is clearly erroneous and no award for lost profits is appropriate. Appellant misunderstands the district court's decision.

At trial, Gannucci testified about the cost of completion. His testimony suggested that, had Royal been allowed to complete the contract, it would have earned a profit equal to 27% of the contract price. The district court did not wholly accept this testimony, but it also did not accept the argument that Gannucci's comments about losing money proved conclusively that Royal would lose money on the project.

The district court stated:

These admissions by Gannucci—about *losing* money on the project—hardly support a finding that Royal would realize a *profit* on the project, much less the 27% profit inherent in the "cost to complete" measure of damages now urged by Royal. In light of those admissions, our use of a 15% profit margin is, if anything, generous. But at least our measure of damages takes those admissions into account; Royal's measure of damages doesn't.

(Emphasis in original.)

The trial court evaluated Royal's evidence about the cost to complete in light of Gannuc-

---

1. The $36,235 in damages ultimately awarded by the district court represents a preliminary damages award of $38,003 reduced by $1,768 attributable to change orders.

ci's admissions and concluded that the cost of completion was greater than Gannucci indicated in his trial testimony. The cost of completion Gannucci claimed at trial would have resulted in greater lost profits than the district court awarded. The amount the district court actually awarded for lost profits reflects a higher cost of completion than Gannucci claimed. In effect, Gannucci's admissions undercut the credibility of his trial testimony about the cost of completion, but they did not persuade the district court that Royal would not make a profit on the job.

Blaine E.D.A. argues that the evidence is more consistent with a conclusion that Royal would not have made a profit or would have lost money on this project. This court does not weigh the evidence. The record contains evidence that Royal expected to earn a 27% profit on the project and evidence that Royal would lose money on the project. The district court's conclusion that Royal could reasonably expect to earn a 15% profit was not clearly erroneous.

■ Blaine E.D.A. argues that, even if the district court correctly concluded that Royal reasonably expected to earn a profit on the project, there was insufficient evidence to prove an amount of damages for lost profits. Blaine E.D.A. claims that Royal submitted only the mere assertions of Gannucci as evidence to demonstrate the cost to complete the project.

> Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount.

*Polaris Indus. v. Plastics, Inc.,* 299 N.W.2d 414, 419 (Minn.1980) (quoting *Leoni v. Bemis Co.,* 255 N.W.2d 824, 826 (Minn.1977)); *Peter Kiewit Sons' Co. v. Summit Constr. Co.,* 422 F.2d 242, 261 (8th Cir.1969) (only reasonable certainty, not absolute certainty, required in estimating damages and doubts generally resolved against party committing breach); see *Frank Sullivan Co. v. Midwest Sheet Metal Works,* 335 F.2d 33, 41–42 (8th Cir.1964) (applying Minnesota law, court sustained verdict awarding damages on basis of estimate of cost of completion by contractor's employee). Thus, "[d]amages for loss of profits will

not be denied merely because of the difficulty of ascertaining them." *Polaris,* 299 N.W.2d at 419.

■ An experienced contractor's best estimate, reasonably compiled, is acceptable evidence. *Frank Sullivan Co.,* 335 F.2d at 41. Blaine E.D.A. did not question Gannucci's qualifications, nor did Blaine E.D.A. challenge Gannucci's cost of completion by offering opposing testimony regarding the cost of completion. Although the co-owner of J.T. Electric, the second lowest bidder for the project, testified as to the total number of hours required to complete the project, he did not testify as to the cost of completion. The district court specifically stated, "We don't know how much it cost J.T. to complete the work." The district court also noted that J.T. Electric had anticipated an 11% profit margin.

Although there is some uncertainty in the amount of profits the district court concluded Royal lost, reasonable certainty is acceptable. Gannucci's testimony and the fact that J.T. Electric anticipated an 11% profit on the project provide a reasonable basis for the district court's finding that Royal could reasonably expect to earn a 15% profit. The district court's finding was not clearly erroneous.

**DECISION**

The January 25, 1992 letter and the January 29, 1991 agenda did not fairly advise Royal that Blaine E.D.A. would terminate the contract if Blaine's inadequate performance was not corrected promptly, and, therefore, did not provide the required written notice to cure before terminating the contract. The district court finding that Royal would have earned a 15% profit if it had been allowed to complete work under the contract was not clearly erroneous.

**Affirmed.**