# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2242

_____

Shireen A. Walsh,                          *
                                           *
                Appellee,                  *
                                           *   Appeal from the United States
        v.                                 *   District Court for the
                                           *   District of Minnesota.
National Computer Systems, Inc.,           *
a Minnesota corporation,                   *
                                           *
                Appellant.                 *

- - - - - - - - - - - - - - - - - - -

Trial Lawyers for Public Justice, P.C.;    *
Program on Gender, Work & Family,          *
                                           *
        Amici on Behalf of Appellee,       *

_____

Submitted:  May 14, 2003

Filed: June 23, 2003 (Corrected July 11, 2003)

_____

Before BOWMAN, HEANEY, and BYE, Circuit Judges.

_____

HEANEY, Circuit Judge.

National Computer Systems, Inc. (NCS) appeals from a judgment of the district court awarding Shireen A. Walsh compensatory damages, punitive damages, prejudgment interest, attorneys' fees, and costs totaling $625,526. It argues the judgment should be set aside because all of Walsh's claims are barred by the applicable statute of limitations, and fail as a matter of law because there is no evidence to support the view that Walsh was discriminated against because of her pregnancy under either Title VII or the Minnesota Human Rights Act (MHRA). It further argues that Walsh was not entitled to punitive damages because she did not prove malice or reckless indifference to her rights. Finally, NCS contends that if punitive damages were appropriately assessed, they were excessive. We affirm.

## I. Background

We review the facts in the light most favorable to the jury's verdict. Walsh worked as an account representative in the customer service division of NCS from May 1993 through October 30, 1998. She was a salaried ("exempt") employee whose duties included selling and renewing service contracts on scanners sold to NCS customers. She was considered a "top performer." Walsh received multiple promotions, regular raises, and consistently favorable performance evaluations throughout her employment at NCS.

In March 1997, Barbara Mickelson became Walsh's supervisor. Walsh was pregnant at the time and experienced medical complications related to her pregnancy, requiring frequent medical attention. NCS maintained a policy that entitled exempt employees to take unlimited sick leave for doctor appointments for themselves or their children, but Mickelson repeatedly asked Walsh for advance notification and documentation of Walsh's doctor appointments. Other account representatives were not required to provide the same information about their appointments.

Walsh took full-time medical leave from April 7, 1997 until the birth of her son on May 9, 1997. She returned to work on August 4, 1997 after her maternity leave, and immediately experienced hostility from Mickelson. When Walsh was showing co-workers pictures of her son on her first day back to work, Mickelson told her to stop disrupting the office and to get back to work. Mickelson gave Walsh's co-workers the afternoon off to go to a craft fair as a reward for having covered Walsh's workload while she was on leave, but Walsh was told to stay in the office and watch the phones. One morning when Walsh arrived at 7:37 a.m. instead of 7:30 because she was delayed by her son's illness, she found an email sent from Mickelson at 7:33 that suggested that Mickelson was scrutinizing Walsh's hours. When Walsh asked if she could change her schedule to leave work at 4:30 p.m. instead of 5:00 because her son's daycare closed at 5:00, Mickelson told Walsh that her territory needed coverage until 5:00 and that "maybe she should look for another job." Other account representatives left work at 3:45 on a regular basis, and Mickelson testified at trial that Walsh's territory did not need to be covered through 5:00. Walsh was required to submit a vacation form when other workers were not. Mickelson attached signs ("Out – Sick Child") to Walsh's cubicle when Walsh had to care for her son, yet notes typically were not placed on other absent employees' cubicles. Mickelson reprimanded Walsh for "chit-chatting" in the cubicle section, when she was actually discussing work with a co-worker. Mickelson referred to Walsh's son as "the sickling." Mickelson placed a note in Walsh's personnel file regarding a minor incident involving Walsh's retrieval of a personal fax intended for a co-worker, as requested by the co-worker. Mickelson informed Walsh that she must make up "every minute" that she spent away from the office for doctors appointments for herself or her son and time spent caring for her son. No other employee was required to make up work for time missed due to appointments and other personal matters. At one point, Mickelson threw a phone book on Walsh's desk and told her to find a pediatrician who was open after hours. When Walsh told Mickelson she needed to pick her son up from daycare because he was ill, Mickelson replied, "Is this an April Fool's joke? If so, it's not at all funny." Walsh fainted at work as a result of stress

and was brought to the hospital. The next day, Mickelson stopped at Walsh's cubicle and told her, "you better not be pregnant again."

In October 1997, Walsh reported to NCS's human resources representative, Mike McRath, that she was being treated differently than other account representatives and was required to make up time spent taking her son to the doctor. In the same month, Walsh's workload was increased without an increase in salary. McRath told her that if she was "accusing management of doing something unethical, she better have proof." In June 1998, when Walsh confronted Mickelson about the way she treated account representatives at a meeting, Mickelson swore at Walsh and pounded on the table. The next day Walsh told Mickelson that she wanted to be treated fairly, and Mickelson responded that it was an issue of manager's discretion. When Walsh reported Mickelson's behavior to Bruce Haseley, human resources manager, he appeared disinterested and told Walsh he could not take sides in the matter. Soon, department changes increased Walsh's responsibilities, which required her to work overtime. Walsh protested and Mickelson yelled at her. They went to Haseley's office for mediation, and Haseley offered no assistance. No investigation occurred either before or after Walsh's departure.

Walsh believed she would not be treated fairly at NCS, so she began to search for another job in October 1998. She accepted employment with West Group and submitted a letter of resignation to NCS on October 19, 1998, effective October 31, 1998. On October 23, 1998, Walsh reconsidered her decision to resign and called Haseley to tell him that because she liked many aspects of her job at NCS, she would stay on if the situation with Mickelson could be worked out and if she were treated fairly. Haseley said he did not think that was possible, but indicated he would speak with Mickelson. He called Walsh back to tell her that Mickelson wished to continue with her termination.

On August 17, 1999, Walsh mailed a charge of gender discrimination against NCS to the Equal Opportunity Employment Commission (EEOC). The charge was cross-filed with the Minnesota Department of Human Rights (MDHR). A right-to-sue letter was issued on August 26, 1999.

On October 15, 1999, Walsh commenced an action and served NCS with a complaint, asserting claims under Title VII, the MHRA, the Family Medical Leave Act (FMLA), the Minnesota Parental Leave Act (MPLA), and the Minnesota Sick or Injured Child Care Act. The complaint was drafted as a federal action, but erroneously filed in Hennepin County District Court. Counsel for Walsh and NCS conferred, and at NCS's request, Walsh withdrew the action from state court and delayed filing the matter in federal court until after settlement negotiations. Negotiations continued through January 12, 2000, but did not result in a settlement. On January 14, 2000, Walsh filed her complaint in federal district court.

Following the close of discovery, NCS filed a motion for partial summary judgment, requesting that the following claims be dismissed: constructive discharge and failure to hire under Title VII, the MHRA, the MPLA, the Minnesota Sick or Injured Child Care Leave Act, and the FMLA; reprisal claims under Title VII and the MHRA; discrimination and denial of benefits under FMLA; retaliation under the MPLA, and denial of benefits under the Minnesota Sick or Injured Child Care Leave Act. NCS did not request that Walsh's hostile work environment claim under either the MHRA or Title VII be dismissed. The district court[1] denied the motion, with the exception of Walsh's complaints under the FMLA and the Minnesota Sick or Injured Child Care Act. Walsh voluntarily dismissed certain claims, including statutory wage violations, breach of contract, and defamation.

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

The remaining claims were tried before a jury in January 2002. The jury found for NCS on Walsh's failure to rehire claim, but found that Walsh: had been subjected to a hostile work environment; had been constructively discharged on the basis of pregnancy or gender discrimination and because she had taken leave; and had been retaliated against on the basis of pregnancy or gender discrimination and leave discrimination. The jury awarded Walsh $11,000 for wage and benefit loss, $45,000 for other damages, and $382,145 in punitive damages. On January 30, 2002, the court ordered judgment entered in Walsh's favor for $438,145.40.

NCS filed a motion for judgment as a matter of law, or, in the alternative, a new trial or remittitur of the punitive damages portion of the jury's award. Walsh filed a motion for attorneys' fees and costs, for a multiplication of her compensatory damages award under the MHRA, for liquidated damages under the FMLA, for prejudgment interest, and to amend the complaint for punitive damages under Minnesota law. The district court adopted the magistrate's[2] report and recommendation, which denied Walsh's motion to amend her complaint, reduced the punitive damages amount to the Title VII statutory cap of $300,000, and denied NCS's motion for judgment as a matter of law. The order granted Walsh's motions to multiply her award under the MHRA, for liquidated damages under the FMLA, for attorneys' fees, and for prejudgment interest. The original entry of judgment was vacated, and judgment of $625,525.90 was entered for Walsh by order dated August 27, 2002. NCS appeals.

---

[2]The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

## II. Discussion

### A. Statute of Limitations

Walsh submitted a written notice of resignation on October 19, 1998, effective on October 31, 1998. However, on October 23, 1998, Walsh informed the human resources office that she would be willing to remain on the job if NCS took steps to end the harassment and discriminatory actions of Mickelson. NCS stated there was nothing it would do to remedy the situation and that Mickelson wanted to proceed with the termination. The district court found that Walsh filed a charge of discrimination with the EEOC on August 18, 1999, within 300 days after NCS informed her that it would not attempt to modify Mickelson's conduct. We agree with the district court that there was no violation of 42 U.S.C. § 2000e-5(e)(1). Walsh's pregnancy discrimination and retaliation claims under Title VII were properly before the district court.

With regard to Walsh's claims of pregnancy discrimination, harassment based on pregnancy, and retaliation under the MHRA, she was required to file a charge or lawsuit within one year of the alleged discrimination and retaliation. Minn. Stat. § 363.06, subd. 3. Walsh's EEOC charge was cross-filed with the Minnesota Department of Human Rights on August 25, 1999. NCS asserts that any pregnancy discrimination claims under the MHRA based on acts prior to August 25, 1998 are time-barred. The district court disagreed, finding that the continuing violation doctrine, discussed in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-17 (2002), supports Walsh's position on the matter. She alleged she suffered a hostile work environment from the day she returned from her leave through October 31, 1998. Her hostile environment claims involved repeated conduct that commenced outside the limitations period, but continued into the one-year statute of limitations period. Because Walsh has alleged a continuing pattern of related discriminatory events rather than discrete discriminatory actions, her hostile environment claim falls

squarely within the <u>Morgan</u> continuing violation theory. Her MHRA claims are not time-barred.

Finally, NCS argues in the alternative that Walsh's Title VII and MHRA claims are time-barred because Walsh filed a federal action 141 days after she received the right-to-sue letter, well beyond the 90-day limit for the Title VII claims and the 45-day limit for the MHRA claims. The district court correctly determined that NCS's attorney's actions "lulled" Walsh into delaying the refiling of her complaint in federal court, and tolled the statute of limitations on the Title VII claims. With regard to the MHRA 45-day statute of limitations period, NCS alleges it never received proper service for the federal claim, and therefore did not receive timely notice of the MHRA claim. The district court determined that although service of the federal claim was defective because the clerk did not sign and seal the summons, NCS suffered no resulting prejudice. It knew the MHRA claim was attached to the federal claim. We affirm the district court on this matter as well, and proceed to the merits of the case.

B.  Judgment as a Matter of Law Claims

We turn to the question of whether the district court erred in refusing to grant NCS's motion for judgment notwithstanding the verdict. We review the district court's decision as to whether to grant a motion for a judgment as a matter of law de novo. <u>Kipp v. Missouri Highway & Transp. Comm'n</u>, 280 F.3d 893, 896 (8th Cir. 2002). The court draws "all reasonable inferences in favor of the nonmoving party, and [does] not make credibility determinations or weigh the evidence." <u>Id.</u> (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)). We must "assume that the jury resolved all conflicts of evidence in favor of [the nonmoving] party, assume as true all facts which the prevailing party's evidence tended to prove, . . . and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence." <u>Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assoc.</u>, 928 F.2d 299, 301 (8th Cir. 1991) (quotation

-8-

omitted).  A jury verdict will not be set aside unless "there is a complete absence of probative facts to support the verdict."  Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 634 (8th Cir. 1998).

### 1.  Failure to Comply with Federal Rule of Civil Procedure 50(a)

Under Fed.R.Civ.P. 50(a)(2), a motion for judgment as a matter of law must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment."  Adherence to the rule is mandatory.  Lynch v. City of Boston, 180 F.3d 1, 13 n.9 (1st Cir. 1999); Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 287 (2d Cir. 1998); Guilbeau v. W.W. Henry Co., 85 F.3d 1149, 1160 (5th Cir. 1996).  "[T]he purpose of requiring the moving party to articulate the ground on which JMOL is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'"  Galdieri-Ambrosini, 136 F.3d at 286 (citations omitted).  If specificity is lacking, judgment as a matter of law may neither be granted by the district court nor upheld on appeal unless that result is "required to prevent manifest injustice."  Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1155 (2d Cir. 1994).  "'[T]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position.'"  Rockport Pharm., Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 197-98 (8th Cir. 1995) (quoting Cortez v. Life Ins. Co. of N. Am., 408 F.2d 500, 503 (8th Cir. 1969)).  If colloquy between counsel and the trial court fleshes out the motion, it may provide the opposing party with the requisite notice.  Galdieri-Ambrosini, 136 F.3d 287.  However, post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion."  Rockport Pharm., 53 F.3d at 197.

NCS filed a motion for a directed verdict when Walsh closed her case, and again at the close of all evidence.  Both motions were denied by the district court.  On neither occasion did NCS submit a memorandum detailing the law and facts upon

-9-

which it requested judgment in its favor, nor did colloquy between counsel and the court sufficiently explain NCS's legal reasoning.[3] After the jury returned its verdict, NCS renewed its motion for judgment as a matter of law pursuant to Rule 50(b). For the first time, NCS filed a thorough memorandum in support of its motion.

We typically do not review the sufficiency of the evidence if the trial court denied a motion that does not state specific grounds as required by Rule 50(a) with which NCS failed to comply. NCS did not support its request for directed verdict with specific legal grounds at the time of its motions. It did not specify the grounds upon which it requested a directed verdict until it filed its renewed motion for judgment as a matter of law following the jury's verdict. We conclude, however, that NCS clarified its position as to some of the causes of action in its memorandum supporting its motion for partial summary judgment. The memorandum provided the plaintiff and the court with notice of its legal position with regard to Walsh's constructive discharge, failure to hire, and retaliation claims under Title VII and the MHRA. It did not, however, request summary judgment on Walsh's hostile work environment claim. Because NCS did not legally challenge the issue below, it is precluded from raising the issue on appeal.

In sum, NCS requested summary judgment on all issues that were ultimately submitted to the jury, with the exception of the hostile work environment claim. The

---

[3]When Walsh closed her case, defense counsel stated, "I'm going to make a motion under Rule 50." (Tr. at 501.) The district court responded that it would take the motion under advisement. Id. "Do I need to make my motion on the record?" asked defense counsel. Id. "You just did," replied the court. Id. At the close of all evidence, defense counsel stated, "[d]efendant moves again at this time on Rule 50 for a directed verdict." (Tr. at 670.) He asked whether the court wanted an explanation, and the court replied, "[n]o, if you feel compelled you can submit something in writing, but . . . I trust that the defense wishes, or plaintiff wishes to stand on the record?" Id. at 671. Defense counsel replied affirmatively, and the court indicated that the motion would remain under advisement. Id.

jury returned verdicts for Walsh on several claims, including hostile work environment, and returned general damage awards of $11,000 and $45,000.[4] This court has made it very clear that where the court submits a single damage question for multiple claims and where the evidence supports the actual damage award on any of the claims, the award will not be set aside. LeSeuer Creamery, Inc. v. Haskon, Inc., 660 F.2d 342, 346 n.7 (8th Cir. 1981); Hinkle v. Christensen, 733 F.2d 74, 76 (8th Cir. 1984). Here the damage awards are clearly supported by the hostile work environment claim.

Furthermore, although NCS indicates it objected to the court's proposed jury instructions and offered its own set of instructions off the record in chambers, it failed to comply with Fed.R.Civ.P. 51 and did not preserve its objection to the provided instructions on appeal. Rule 51 mandates that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." "Our law on this subject is crystal clear: to preserve an argument concerning a jury instruction for appellate review, a party must state distinctly the matter objected to and the grounds for the objection on the record."

---

[4]If you find in favor of the plaintiff on any of the above claims, answer the following questions:

1. We, the jury, find plaintiff's lost wages and benefits through the date of this verdict to be:

$11,000.

2. We, the jury, find plaintiff's other damages, excluding lost wages and benefits, to be:

$45,000.

(Emphasis added.)

-11-

Dupre v. Fru-Con Eng'g, Inc., 112 F.3d 329, 334 (8th Cir. 1997) (emphasis added). NCS cannot now claim that Walsh is barred from recovering compensatory damages on her hostile work environment claim. We therefore affirm the jury's verdict and award of compensatory damages.

2. The Merits of the Case: Gender Discrimination on the Basis of Pregnancy

Even if NCS had preserved its right to appeal the jury's verdict on the hostile work environment claim, the facts of the case support Walsh's claim that she was a member of a protected class and was discriminated against on the basis of her pregnancy. Congress amended Title VII to incorporate pregnancy discrimination within the purview of Title VII's protection against gender discrimination. The amended statute provides in part:

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as others persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k). NCS argues that Walsh is alleging parent or caretaker discrimination, which is not proscribed by Title VII. See Piantanida v. Wyman Ctr., Inc., 116 F.3d 340, 342 (8th Cir. 1997) (holding that childcare is not gender specific in the way that pregnancy and childbearing are, and that any discrimination experienced on the basis of a parent's decision to care for a child is not actionable because parenthood is not a protected class). Walsh asserts that she was discriminated against not because she was a new parent, but because she is a woman who had been pregnant, had taken a maternity leave, and might become pregnant

again. "Potential pregnancy . . . is a medical condition that is sex-related because only women can become pregnant." Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 680 (8th Cir. 1996). Because Walsh presented evidence that it was her potential to become pregnant in the future that served as a catalyst for Mickelson's discriminatory behavior, we will not disturb the jury verdict.

Once Walsh returned to work from her maternity leave, Mickelson made several discriminatory remarks to her. During a discussion about Walsh's co-worker's pregnancy, Mickelson sarcastically commented to Walsh, "I suppose you'll be next." On another day, Walsh took a half-day vacation to go on a boat trip with her husband. After she returned, Mickelson stated, "[w]ell, I suppose now we'll have another little Garrett[5] running around." On April 23, 1998, Walsh fainted at work and had to go to the hospital. The following day Mickelson stopped by Walsh's cubicle and said, "You better not be pregnant again!" Furthermore, when Walsh was pregnant, Mickelson asked Walsh for advanced notification and documentation of her doctor appointments, while other account representatives were not required to provide the same information concerning their appointments. Mickelson's comments, combined with the conduct detailed above in Section I of this opinion, provide ample support for the jury's finding that Walsh was discriminated against on the basis of her pregnancy.[6]

---

[5]The name of Walsh's son.

[6]Moreover, NCS conceded there were fact questions regarding whether Walsh was treated differently as a result of her pregnancy and stated that the issue was "inappropriate for resolution in a motion for summary judgment." Defendant's Reply Memorandum in Support of Motion for Partial Summary Judgment at 2 n.3 (No. 00-CV-82).

C.  Punitive Damages

Title VII allows for an award of punitive damages if the defendant committed illegal discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  "Reckless indifference" means that the defendant had "knowledge that it may be acting in violation of federal law."  Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999).  Reckless indifference may be imputed to the employer if an employee commits a discriminatory act while serving in a managerial capacity and acts within the scope of employment.  Id. at 543.  We have upheld punitive damages awards in cases where the employer has deliberately turned a deaf ear to discriminatory conduct.  Beard v. Flying J, Inc., 266 F.3d 792, 804 (8th Cir. 2001) (punitive damages appropriate where specific complaints about sexual assault were made and the company failed to take action); Henderson v. Simmons Foods, Inc., 217 F.3d 612, 619 (8th Cir. 2000) (punitive damages appropriate where plaintiff had specifically complained to her supervisors over forty times of sexual assault and supervisors did not take action, refused her request for a transfer).

The record shows that NCS had knowledge that it may have been acting in violation of federal law by not investigating Walsh's complaints that she was being treated unfairly.  Mickelson testified that she had received training on NCS's nondiscrimination corporate policies.[7]  She indicated she understood that harassment on the basis of sex was inclusive of discriminating against someone for being pregnant.  Bruce Haseley and Michael Sherck testified that NCS has a policy prohibiting the harassment of women on the basis of pregnancy and requiring a

---

[7]NCS's nondiscrimination policy is listed under the Equal Employment Opportunity section of the Human Resources Guidelines, suggesting the principles are founded in federal law.

-14-

prompt investigation of any allegation of a policy violation.[8] Haseley also testified that he would take very seriously a complaint that a manager was making derogatory remarks about people getting or possibly being pregnant. He claimed, however, that there were never allegations to investigate because Walsh had never complained that she was being discriminated against on the basis of sex.

---

[8]The colloquy between counsel and Haseley was as follows:

Q. NCS has a policy that it will not discriminate, is that correct?

A. That's correct.

Q. And not subject people to harassment either, is that right?

A. That's correct.

Q. Is it your understanding that harassment includes more than sexual harassment, can include harassment based upon gender, for example?

A. That's correct.

Q. And gender can include such things as pregnancy and the conditions of being a woman, right?

* * *

A. Yes, that's correct.

Q. And so NCS has a policy that it won't discriminate or harass women on the basis of pregnancy or pregnancy leave, maternity leave, is that correct?

A. That's correct.

(Tr. at 162-63.)

In fact, there were at least ten separate reports to human resources that Walsh was being treated unfairly. Walsh reported Mickelson's conduct at least six times. Amy Elmer, a co-worker, testified that when she was pregnant she reported Mickelson's abusive conduct toward Walsh and herself to Haseley and Michael Sherck, Mickelson's supervisor. Nancy Immediato testified that she had reported Mickelson's discriminatory comments related to pregnancy to several NCS supervisors, but that no one responded to her complaints. Sherck admitted that he knew about the allegations of pregnancy discrimination and had asked Haseley to investigate them.

In spite of the NCS supervisors' knowledge of alleged harassment on the basis of pregnancy, NCS did not investigate the reported complaints. Haseley admitted NCS conducted an investigation of the high turnover rate in Mickelson's department, but denied there had been specific, gender-based complaints that would prompt an investigation into Mickelson's discriminatory conduct. Walsh testified she talked to Haseley about her having to report her absences to Mickelson and the way Mickelson treated her. Haseley responded that he could not take sides on the matter. Walsh told Haseley she would consider staying with NCS if he could assure her that her working conditions under Mickelson would improve. Haseley refused. Although Walsh may not have specifically stated to management that Mickelson's conduct rose to the level of a federal violation, she need not have made such a specific complaint. Mickelson, Haseley, Sherck and McRath were aware that NCS's nondiscrimination policy, consistent with federal law, prohibited comments and conduct that disparaged pregnancy and potential pregnancy. In light of these facts, we hold there is sufficient evidence that NCS demonstrated reckless indifference to the numerous allegations of pregnancy discrimination reported by several women, including Walsh. We affirm the jury's verdict that NCS acted with the requisite reckless indifference that gives rise to an award of punitive damages.

Finally, we reject NCS's contention that the punitive damages award must be vacated because it is excessive and unconstitutional. In determining whether an award of punitive damages is excessive, we must consider "the degree of reprehensibility of the defendant's conduct and the ratio between the actual harm inflicted on the plaintiff and the punitive damages award." Beard, 266 F.3d at 804 (quotation omitted). Initially, it is important to note that NCS did not argue before the jury that punitive damages should not be awarded. The district court reduced the punitive damages award from $382,145.40 to $300,000 and increased the compensatory damages award from $56,000 to $112,000. The ratio of statutorily modified punitive damages to compensatory damages is 3 to 1. The ratio of unmodified damages is 6.8 to 1.

Either way, the punitive damages award is not grossly excessive, either numerically or in relationship to the hostile environment in which Walsh worked. See Ogden v. Wax Works, Inc., 214 F.3d 999, 1011 (8th Cir. 2000) (rejecting argument that ratio to compensatory damages of 6.5 to 1 was excessive); Kimbrough v. Loma Linda Dev., Inc., 183 F.3d 782, 785 (8th Cir. 1999) (upholding a punitive damages award with a 10 to 1 ratio to compensatory damages). Additionally, as detailed above, NCS's conduct was reprehensible. It failed to take any action to investigate Walsh's complaints about the discriminatory working conditions under Mickelson's direction, and management repeatedly told Walsh that it did not want to get involved in the dispute. Failing to take action on repeated complaints of mistreatment and misconduct is precisely the type of conduct punitive damage awards are intended to deter. We therefore affirm the award of punitive damages.

## III. Conclusion

For the reasons cited above, we affirm the jury's verdict and award of damages.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.