# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-1443

———————

Conseco Finance Servicing Corp.,     \*
formerly known as Green Tree     \*
Financial Servicing Corporation,     \*
    \*
        Appellee,     \*
    \*   Appeal from the United States
     v.     \*   District Court for the
    \*   Eastern District of Missouri.
North American Mortgage     \*
Company, successor Washington     \*
Mutual Bank, F.A.,     \*
    \*
        Appellant.     \*

———————

Submitted: January 12, 2004
Filed: August 27, 2004

———————

Before MORRIS SHEPPARD ARNOLD, RICHARD S. ARNOLD, and SMITH,
    Circuit Judges.

———————

SMITH, Circuit Judge.

After considering Conseco Finance Servicing Corporation's (Conseco's)[1] unfair competition and tortious interference claims against North American Mortgage Company (North American), a jury returned a verdict against North American on

———

[1] Formerly known as Green Tree Financial Servicing Corporation.

each of the claims and awarded Conseco $3.5 million in actual damages and $18 million in punitive damages. On appeal, North American argues that the district court erred when it 1) submitted the unfair competition claim to the jury, 2) failed to grant judgment as a matter of law, 3) found that the compensatory award was supported by the evidence, and 4) allowed the punitive damage award to stand. We affirm in part and reverse in part.

## I. *Background*
### A. *Facts*

Conseco is a Delaware financial services company with its principal place of business in Minnesota. Conseco's mortgage service division originates residential loans for individuals in the "subprime" lending market, *e.g.* individuals with low credit scores. North American competes for individuals in the same market. The facts and issues in this case arise from actions taken by North American to acquire information about individuals that is contained in Conseco's confidential files. North American sought this information in an attempt to pursue Conseco's loan customers and business leads.

Conseco generates potential customer leads through a computerized database, which Conseco developed, that analyzes financial information from over forty million individuals.[2] Conseco's computer program identifies individuals who might "benefit" from its debt-consolidation services and compiles a list of the potential customers, which is sent to Conseco's branch offices throughout the country in the form of "customer lead sheets."

---

[2] Conseco also employs other strategies to generate new business including internet advertising, telemarketing campaigns, "cross-marketing" of current customers, direct mail, television, radio, and yellow page advertising, and referrals from various business associates.

-2-

Conseco organizes these lead sheets according to color–the most promising are colored red, leads that are considered good are colored white, and merely decent leads are colored blue. Once a lead sheet is received in a branch office, the office manager then forwards it to a loan originator, who calls these potential customers to offer Conseco's financial services. To insure the confidentiality of these lead sheets, Conseco requires all employees to sign a form that acknowledges their receipt and understanding of the contents of Conseco's Employee Handbook. This handbook states that "non-public information about customers, dealers, and others is strictly confidential."

In 2000, over the course of several months, a substantial number of Conseco's office managers and loan originators resigned, and many of Conseco's former employees took jobs working for North American. Several of these former Conseco employees resigned after receiving solicitations from North American. In some instances, the former Conseco office managers also took their staffs of loan originators with them to North American.

During this same period, Conseco's mortgage service division downsized. Most notably, Conseco's management decided to discontinue loan services in the subprime lending market. A number of these now former employees testified (at the preliminary injunction hearing) that because Conseco was leaving the subprime lending market, they worried about their future, especially considering the fact that they worked on commission. Some of these former employees also expressed concern about Conseco's overall future financial performance. Indeed, Conseco had closed thirty of its 150 branch offices within the previous year. Also, some employees noted that Conseco had recently placed significant restraints on its area managers' loan authority.

Shortly after this employee exodus began, Conseco received a letter from one of its St. Louis branch customers, Michael Mambretti, complaining that his

confidential loan information had been taken by a Conseco loan originator, from Conseco to North American. Mambretti learned this fact through a phone call from a North American loan originator. The caller informed Mambretti that all of his personal financial information–which he had entrusted to Conseco–had moved with the loan originator to North American's St. Louis office.

In response, Conseco sent a copy of Mambretti's letter to North American with a request that North American "cease and desist" from taking and using information contained in Conseco's loan files. Conseco also asked that North American return all of the information that it had acquired from Conseco's former employees. However, North American neither returned the stolen information nor discouraged its employees' use of Conseco's loan files and lead sheets. Quite the contrary, North American encouraged others in its offices to replicate the St. Louis scheme, and designated its St. Louis office as a "model" to expand into other cities.

B. *Pre-Trial*

Conseco filed a three-count complaint alleging 1) misappropriation of trade secrets, 2) unfair competition, and 3) tortious interference with business relations. Conseco also filed a motion for a temporary restraining order prohibiting certain North American employees from taking, using, or disclosing documents from Conseco's loan files, and to return any information taken from Conseco's files. The district court granted a temporary restraining order ("TRO") prohibiting these named North American employees from taking, using, or disclosing documents from Conseco's loan files, and requiring the return of any information taken from Conseco's files.

Conseco also filed a motion seeking a preliminary injunction and a permanent injunction to prevent the "raiding" of its employees. In support of this motion, Conseco identified three former employees that it alleged had misappropriated its trade secrets. The first, Kevin Kattleman, a former area manager in its O'Fallon,

Illinois, office, testified that fourteen customer loan files from Conseco were in his possession after he began to work for North American. These loan files included personal financial statements of Conseco customers, loan applications, appraisals, income calculation worksheets, W-2 forms, payroll information of Conseco customers, income calculation worksheets, tax returns, and bank statements of Conseco customers. These files were located in Kattleman's office at North American until he returned them to Conseco, as ordered by the district court in its TRO. Kattleman testified that he was uncertain as to exactly how the customer loan files came to be located in his office at North American.

The second, Kevin Podner, a former area manager from Conseco's office in Springfield, Illinois, testified that shortly before his resignation from Conseco, he made a copy of a substantial number of loan applications on which he had worked during his time with Conseco. Podner did not specify the exact number of loan applications copied. Podner said he copied the files in order to aid an employee who wished to make the transition to loan originator. Podner further testified that in his line of work, it was very common to help new loan originators in this manner, as it is much easier to generate new business with customers who have previously conducted business with Conseco.

Finally, Scott Bristol, a former area manager at Conseco's St. Charles, Missouri, office, testified that although he did not have personal knowledge that any loan originators working under him in St. Charles made copies of customer loan applications, it was possible that such copying did occur. Bristol also stated that he encouraged three of the loan originators working under him at Conseco to resign and come to work with him at North American. Bristol also testified that before leaving Conseco, he compiled a list of 100 to 200 customers who had previously engaged in business with Conseco. This list included the names and phone numbers of these customers. Upon arriving at North American, Bristol gave these names and numbers to loan originators as leads, who contacted these former Conseco customers. Bristol

testified that he believed between one to six of these leads resulted in new business for North American. However, he speculated that as many as ten of these former Conseco customers could have switched their business to North American.

Bristol also returned a number of documents at his deposition, in accordance with the district court's TRO. These documents contained information concerning Conseco's internal operations, including monthly retail point income reports generated by each Conseco office, reports ranking the retail volume by branch, reports of retail loans funded by region, financial summaries of each branch, expense ratio reports, expense analysis reports, expense analysis retail volume variance reports, and reports on credit insurance protection.

Bristol also testified that he began his employment with North American on June 30, 2000, but did not resign his position with Conseco until July 12, 2000. Consequently, he was employed by both companies during this two week period. At the preliminary hearing, Bristol testified that he and the other Conseco employees were put on the payroll of North American on June 30, 2000, for "benefits purposes," and that they did not work for both companies at the same time. Later, at trial, he admitted they were working for both companies at the same time.

After the preliminary hearing, the district court entered a narrowly-tailored injunction. It determined that Conseco's lead sheets and documents in its loan files are trade secrets, but also determined that Conseco's customer lists and certain financial information are not trade secrets. It further found that Conseco was likely to succeed on its claims of misappropriation of trade secrets against North American relating to the actions of Podner and Kattleman, but not Bristol. It then entered an injunction against North American, Podner, and Kattleman from soliciting customers who had documents taken from their loan files.

The district court, however, denied Conseco's remaining request for injunctive relief relating to North American's solicitation of its employees. Conseco appealed the district court's denial of injunctive relief as to its "raiding" claim. We, however, affirmed the decision of the district court to deny the injunction. *Conseco Fin. Servicing Corp. v. North American Mortgage Co.*, 24 Fed. Appx. 655 (8th Cir. 2001).

Conseco, in its "First Amended Complaint," added two additional counts—participation in breach of fiduciary duty, and a separate count for injunctive relief. North American moved for summary judgment, and the district court granted North American's motion as to misappropriation of customer lists and certain financial information. It also granted summary judgment in North American's favor as to solicitation of employees and participation in breach of fiduciary duty. However, the district court denied North American's summary judgment motion relating to misappropriation of lead sheets, documents in Conseco's loan files, unfair competition, and tortious interference with business relations. The parties proceeded to a trial on the merits for these issues.

## C. *Trial*

At trial, Conseco's evidence established that thousands of Conseco's lead sheets were in North American's possession, that employees worked simultaneously for both companies, that Conseco's loan documents were faxed to senior management at North American, and that employees from several of Conseco's offices had taken Conseco's loan documents to North American.[3] Conseco offered expert testimony that approximately five percent of Conseco's lead sheets result in funded loans, each with an average-net profit per loan of $4,000. Conseco's financial analysts estimated that Conseco suffered compensatory damages of between $3.5 million and $3.9 million.

---

[3] One of North American's own witnesses admitted that North American had improperly taken Conseco's documents and repeatedly lied about it during the discovery process.

North American senior manager, Ken Keeler, provided rebuttal expert testimony, stating that the average-net profit on a loan was $2,100.[4] Carrie Hiatt, a North American witness, further testified that approximately ten percent of certain Conseco leads resulted in funded loans. Another of North American's witnesses, Perry Schatz, testified only five percent of Conseco's leads result in a funded loan.

At both the close of Conseco's case and the close of all of the evidence, North American filed motions for directed verdict, which were argued before the court. Both motions were denied by the district court, and the case was submitted to the jury on Conseco's claims of unfair competition and tortious interference. After the jury returned a verdict against North American on each of the claims, North American filed several post-trial motions, primarily relating to the damage awards. The district court upheld each of the awards, noting that North American's conduct was "widespread and systematic" and "reprehensible," and that the award was "not an injustice, but rather appropriate in light of the evidence." The instant appeal ensued.

## II. *Discussion*
### A. *Unfair Competition*

For its first assignment of error, North American directs our attention to Conseco's unfair competition claim that is founded on North American's alleged misuse of Conseco's trade secrets.[5] North American argues that the district court erred in its initial decision to submit this claim to the jury and then in its subsequent declination to grant a judgment as a matter of law. We review the district court's denial of a motion for judgment as a matter of law de novo, applying the same

---

[4] His estimate was based on an average loan size in the Midwest of $85,000.

[5] The unfair competition instruction to the jury was expressly predicated on trade secret misuse, while the tortious interference claim concerned the issue of wrongful and unjustified interference with Conseco's reasonable expectation of economic advantage or benefit.

standard as the district court. *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 619 (8th Cir. 2003). We will consider the evidence in the light most favorable to the verdict, giving the prevailing party the benefit of all reasonable inferences, *Id.* at 619, and we will not judge the credibility of the witnesses or weigh the evidence. *Id*. We will not set aside the jury verdict unless there is a complete absence of probative facts to support the verdict. *Walsh v. National Computer Systems, Inc*., 332 F.3d 1150, 1158 (8th Cir. 2003).

In order to recover damages for unfair competition, Conseco was required to prove 1) the existence of a trade secret, 2) the communication of the trade secret to another, while that former employee was in a position of trust and confidence with Conseco, and 3) the use of the trade secret that damaged Conseco. *Pony Comp., Inc. v. Equus Comp. Sys. of Mo., Inc*., 162 F.3d 991, 998 (8th Cir. 1998). According to Missouri law, a "trade secret" is information–including but not limited to–technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. *Lyn-Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 697–698 (Mo. App. 1999). Also, in order to be considered a trade secret, the information must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *Id*.

Initially, we must determine whether Conseco's lead sheets and the information contained in its customer files constitute trade secrets under the Missouri Uniform Trade Secrets Act. *See* Mo. Ann. Stat. § 417.453(4) (1995). Although it is undisputed that the lead sheets themselves are not generally accessible to the public, North American asserts that much of the information contained within these lead sheets can either be purchased from various credit agencies or found in mortgage records, all of which are accessible to the public. Conseco counters that while some of the

information within these lead sheets can be harvested from these two sources, its proprietary computer program provides a unique depth of information that cannot be obtained from alternative sources and its loan files contain confidential customer information.

We agree that both the lead sheets and the information contained in these customer files constitute trade secrets under the act. The lead sheets are a product of a specialized–and apparently quite effective–computer program that was uniquely Conseco's. The ultimate product of the lead sheets–the loan file–contained financial statements, loan applications, appraisals, income calculation worksheets, W2 forms, payroll information of Conseco customers, tax returns, and bank statements of Conseco customers. It is clear to us that Conseco derives economic benefit from this information. Indeed, through possession of these loan files, Conseco is in a unique position of being able to analyze its customers' specific financial needs and identify those current customers who may need additional Conseco financial services.

Furthermore, Conseco takes reasonable steps to ensure the secrecy of these files. Witnesses for both parties testified that the information contained in these files was recognized by all Conseco employees as confidential, and therefore not to be disclosed. Conseco's Employee Handbook specifically states that "non-public information about customers, dealers, and others is strictly confidential." Consequently, we agree with the district court that the lead sheets and the information contained in Conseco's customer loan files constitute trade secrets within the meaning of the Missouri Uniform Trade Secrets Act.[6]

---

[6] In arguing that the lead sheets are not "trade secrets," North American principally relies on *Vigoro Indus., Inc. v. Cleveland Chem. Co.*, 866 F. Supp. 1150 (E.D. Ark. 1994), *aff'd* in relevant part, 82 F.3d 785 (8th Cir. 1996). The case involves employees leaving an agriculture supply business to join a competitor. Vigoro contended that the names of 200 former customers constituted a trade secret.

Having concluded that these lead sheets and loan files constitute trade secrets, we must next consider whether Conseco produced evidence of actual or threatened misappropriation of these trade secrets. Conseco asserts that Kevin Kattleman, Kevin Podner, and Scott Bristol all removed customer loan files–or copies of the files–from Conseco's offices. It is undisputed that fourteen Conseco customer loan files were in Kattleman's possession after he resigned from Conseco. Furthermore, these customer loan files eventually made their way to his office at North American. Conseco produced evidence that would allow a reasonable finder of fact to conclude that there was at least a threat of misappropriation of the trade secrets contained in these fourteen files. Therefore, Conseco established a proper misappropriation claim with regards to these fourteen loan files.

Additionally, Conseco produced evidence that Podner made copies of an unspecified number of customer loan files shortly before his resignation. Podner testified that the number was substantial. Although Podner claims he made these copies in order to help a fellow employee make the transition to loan originator, Conseco provided evidence that would allow a reasonable finder of fact to determine that a threat of misappropriation existed with regard to these specific files. Podner's wholesale copying of customer loan files, which coincided with his resignation from Conseco and hiring by North American, creates at least the threat of

---

The court rejected this argument noting that this was a geographic area where everyone knows everyone else,"and you simply need to "see and ask" to identify customers. The court also defined "readily ascertainable" to mean that the plaintiff did not spend a great deal of time or effort compiling that information. The present scenario is clearly distinguishable. This instant case involves thousands of customers–located throughout the country–who were identified through a complex computer system. In *Vigoro*, the court noted that if the contacts had been located throughout the country the information would have been considered to be a trade secret. *Id.*

misappropriation. Therefore, Conseco established a second misappropriation claim in regard to those specific loan files copied by Podner just prior to his resignation from Conseco.

Conseco also presented evidence that in its Davenport, Iowa, office–after the filing of the lawsuit–the area manager, Rick Lasek, worked for both companies, copied thousands of Conseco lead sheets, sent them to North American, copied all of the HUD settlement statements from his office, and stated that his goal was to "put the mother[****]ers [Conseco] out of business." North American management consented to the document duplication by its employees. Two of the loan originators that Lasek recruited to leave Conseco with him eventually returned to work at Conseco–after a change of heart–and testified about Lasek's actions.

In viewing this evidence in the light most favorable to the verdict, we hold there is ample evidence supporting each element of an unfair competition claim. Because the evidence is susceptible to a reasonable inference supporting the verdict, we affirm the district court's decision to submit this claim to the jury and its subsequent denial of judgment as a matter of law.

### B. *Tortious Interference*

Next, North American claims that because the Missouri Uniform Trade Secrets Act has replaced all common-law remedies, no tort claim is maintainable unless the information qualifies as a "trade secret" under the statute. Because we have found adequate evidence of the existence of a trade secret, we need not address North American's argument. We will leave the question of whether tortious interference remains an independent claim to another court and another day. We do, however, make this procedural observation–North American failed to raise the issue of submissibility of the tortious interference claim in its directed verdict motion either

at the close of Conseco's case or at the close of all evidence. *See* Fed. R. Civ. P. 50(a)(2) (stating that litigants must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.")

## C. *Compensatory Damage Award*

North American next argues that, even if the loan files and lead sheets are considered trade secrets, Conseco still "did not make a submissible case of either the fact of damages or the amount of damages." Most persuasively, North American contends that the "exacting" nature and quality of proof needed for recovery of lost profits in Missouri required Conseco to prove net profits by introducing evidence "of the cost and expense of operating the business during these periods." *Meridian Enters. Corp. v. KCBS, Inc.*, 910 S.W.2d 329, 331–332 (Mo. App. 1995). Accordingly, North American concludes that there was insufficient evidence, absent proof of net profit, for any submissible cause of action to survive and requests that we overturn the jury verdict as a matter of law and enter judgment in North American's favor.

In response, Conseco contends that North American failed to comply with the requirements of Fed. R. Civ. P. 50 in its request for judgment as a matter of law and thus has not preserved this argument for appeal. We agree. Rule 50(a) requires that challenges to the sufficiency of the evidence must be raised initially at the close of the evidence. Such challenges must be sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion. Fed. R. Civ. P. 50(a)(2). The purpose of requiring the moving party to articulate the ground on which the Rule 50 judgment is sought "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998). If specificity is lacking, judgment as a matter of law may neither be granted by the district court nor upheld on appeal unless such a result is "'required to prevent

manifest injustice.'" *Walsh*, 332 F.3d at 1158 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994)).

However, the rules are such that "'technical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position.'" *Rockport Pharm., Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197–98 (8th Cir. 1995) (quoting *Cortez v. Life Ins. Co. of N. Am.,* 408 F.2d 500, 503 (8th Cir. 1969)). If colloquy between counsel and the trial court fleshes out the motion, it may provide the opposing party with the requisite notice. *Galdieri-Ambrosini*, 136 F.3d at 287. However, a post-trial motion for judgment '"may not advance additional grounds that were not raised in the pre-verdict motion.'" *Walsh*, 332 F.3d at 1158 (quoting *Rockport Pharm., Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995)). Accordingly, "a motion for judgment as a matter of law at the close of the evidence 'preserves for review only those grounds specified at the time, and no others.'" *Zachar v. Lee*, 363 F.3d 70, 72 (1st. Cir. 2004) (quoting *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 716 (1st Cir. 1994)).

If the Rule 50(a) motion is denied and the case is submitted to a jury, the movant must renew the motion once again in order to preserve the issue for appeal. *See* Fed. R. Civ. P. 50(b); Martin H. Redish, 9 *Moore's Federal Practice* ¶ 50.41 (3d ed. 2003). Adherence to the rule is mandatory. *Walsh*, 332 F.3d at 1158. The grounds for the renewed motion under Rule 50(b) are limited to those asserted in the earlier Rule 50(a) motion. *Sanchez*, 37 F.3d at 723. In other words, the movant cannot use a Rule 50(b) motion "as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." *Zachar*, 363 F.3d at 72 (quoting *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1188 (1st Cir. 1995)).

-14-

North American argued in its Rule 50(a) motion (styled "Motion for Directed Verdict") that Conseco "failed to offer sufficient proof that it sustained damages that were proximately caused by [North American's] use or misappropriation of trade secret documents." Following the jury verdict, North American renewed its motion under Rule 50(b). And, consistent with Rule 50, North American restated–in similar but not precise language–its previously articulated proximate cause damage theory, "[Conseco] failed to prove a causal connection between any conduct properly actionable and any loss to [Conseco]." However, North American also introduced several new legal theories–related to damages–not distinctly articulated in its "Directed Verdict Motion." On appeal, North American questions not whether Conseco proved sufficient connection of its damages to North American's alleged wrongful conduct but whether Conseco proved it had incurred damages at all. At the close of the evidence, North American sought judgment as a matter of law arguing that the there was no causal connection between the alleged wrongdoing and the damages. Such an objection[7] is simply not sufficient to preserve, and certainly cannot be read to encompass, the legal theories underlying North American's Rule 50(b) motion and this appeal (submissibility of the claim). *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1061 (8th Cir. 1993).

On appeal, North American offers an eloquent and persuasive argument regarding the stringent requirements relating to the calculation of lost profits,

---

[7] It is apparent that North American developed the theory raised in their Rule 50(b) motion only after the jury's verdict because it (1) failed to object to the general-verdict form, (2) offered no jury instructions explaining Missouri's difficult proof standard for lost profits, and (3) made no substantive objection to the damage instruction. If North American's net-profit theory had been conceived prior to trial, it would–and should–have asked for such an instruction. It did not, and by failing to do so, North American forfeited its argument to the extent that it was not forfeited by the failure to assert those grounds in their Rule 50(a) motion.

-15-

particularly in relation to "net" profits. However, these were not the "specific grounds" on which North American argued below. Given North American's failure to comply "with Rule 50, our review is limited to 'whether the record reflects an absolute dearth of evidentiary support for the jury's verdict.'" *Zachar*, 363 F.3d at 74 (quoting *Davignon v. Clemmey*, 322 F.3d 1, 13 (1st Cir. 2003)). Under this standard, the district court will only be reversed when "its ruling is obviously insupportable." *Id.* A review of the record leaves us with no doubt that the jury had sufficient evidence before it (albeit conflicting evidence) to conclude that North American had engaged in unfair competition and caused damage to Conseco.

Furthermore, even if North American's pre-verdict objection could be construed as a challenge to the submissibility of the unfair competition claim,[8] the tortious interference judgment remains. The jury's $3.5 million compensatory award was issued by general verdict, after the jury returned verdicts for Conseco on two claims, unfair competition and tortious interference. "This court has made it very clear that where the court submits a single damage question for multiple claims and where the evidence supports the actual damage award on any of the claims, the award will not be set aside." *Walsh*, 332 F.3d at 1159; *LeSueur Creamery, Inc. v. Haskon, Inc.*, 660 F.2d 342, 346 n.7 (8th Cir. 1981); *Hinkle v. Christensen*, 733 F.2d 74, 76 (8th Cir. 1984). Here the damage award is further supported by the remaining tortious interference claim.

---

[8] We agree with the district court that the common-law claim of unfair competition has likely been replaced by the statutory offense described in the Missouri Trade Secrets Act. However, because North American failed to properly preserve the displacement question we need not decide the issue conclusively. Further, because the common law and the statutory elements of the claim remain the same, any resulting error would likely be harmless. Accordingly, we find no error in the submission.

-16-

## D. *Punitive Damage Award*

Finally, we turn our attention to the punitive damage award and consider the three distinct challenges raised by North American–whether the award was (1) against the weight of the evidence, (2) in violation of due process, and (3) grossly excessive. The net worth of North American is approximately $3.6 billion.[9] Here, the jury awarded punitive damages of $18 million and compensatory damages of $3.5 million, resulting in a 5.14 to 1 ratio. Specifically, North American argues that its conduct was not outrageous and did not justify the award, that there was no corporate wrongdoing by North American, and that the punitive damages were an improper remedy for its discovery abuses.[10]

On appeal, the district court's determination of punitive damages is reviewed under an abuse of discretion standard. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 435 (2001). However, when passing on a district court's determinations concerning the constitutionality of the punitive award, we use a de novo standard of review. *Id.* at 435.

Missouri law places no limit on punitive awards, but requires that "when punitive damages are awarded by a jury, both the trial court . . . and the appellate court review the award to ensure that it is not an abuse of discretion." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 576 (8th Cir. 1997). The factors to be considered

[9] This figure is based on the net worth of North American Mortgage, a division of Dime Savings Bank of New York. At the time of trial, Dime Savings had been acquired by Washington Mutual, a company with a net worth of several times this amount.

[10] North American argues that the punitive damages were an improper remedy for its discovery abuses. However, the record is clear that the district court repeatedly rejected Conseco's requests that it be allowed to introduce evidence of North American's discovery abuses.

include "the degree of malice or outrageousness of the defendant's conduct, aggravating and mitigating circumstances, the defendant's financial status, the character of both parties, the injury suffered, the defendant's standing or intelligence, and the relationship between the two parties." *Id.* As such, the district court abuses its discretion in permitting a punitive damage award to stand when the award is so disproportionate to the factors relevant to the size of the award that it reveals "improper motives or a clear absence of the honest exercise of judgment." *Id.*

Punitive damages are also subject to limitations imposed by due process. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996). In our review of the punitive damages award, the Supreme Court instructs us to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.[11] *Gore*, 517 U.S. at 575 (1996). The Supreme Court described the first *Gore* guidepost–the degree of reprehensibility of the defendant's conduct–as the most important indicium of the reasonableness of a punitive damages award. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *Gore*, 517 U.S. at 575). A due process violation occurs when the punitive damages imposed by the jury are grossly excessive. *Id.* at 416–417 (2003).

---

[11]As to the third *Gore* guidepost, North American concedes there is "no precise cognate in Missouri criminal law," but attempts to use the Missouri commercial bribery statute, RSMo 570.150.1(3). That statute authorizes a fine of $5,000. However, we do not consider this offense to be "comparable" in either substance or magnitude–North American's actions were widespread and affected thousands of people, most without their knowledge, and involved confidential financial records.

Therefore we begin by noting that the district court gave correct and distinct instructions relating the purpose and standard for punitive damages, and turn our focus to the reprehensibility of North American's conduct. We agree with the district court's observation that North American's "reprehensible" actions involved management, and were "widespread and systematic, spanning six or seven offices and involving numerous groups of employees." As noted by the district court, North American management knew that employees were working and being paid by both companies at the same time.[12] Rather than undertake any investigation, corrective, or disciplinary action, it elected to use the dual employment as a "model" in other offices. Indeed, the conduct involved repeated actions in multiple offices.[13] North American's actions also involved trickery and deceit, and an utter disregard for Conseco and–even more heinously–the privacy of its customers.

North American responds that the Conseco employees engaged in these acts because of Conseco's financial woes, and that they were simply concerned about their livelihood. However, the jury (and the district court) rejected this theory, opting for an alternative explanation–North American's desire to expand into the subprime

---

[12] The record establishes that Scott Bristol told North American's senior management that he had not resigned from Conseco when he started working at North American. In early August 2000, Conseco sent a letter notifying North American's legal department of the misconduct by Scott Bristol and his loan originators and asking that it stop. Also, North American's senior manager, Wade Hershel, received faxes containing Conseco loan documents originating from Conseco's St. Louis branch office from loan originators with this clandestine dual-employment status. And, one of North American's senior managers, Carrie Hiatt, knowingly authorized Rick Lasek to work in North American's Des Moines office while Lasek was still employed by Conseco.

[13] There was evidence of wrongdoing in several North American locations including: St. Louis, Missouri; Collinsville, Illinois; Springfield, Illinois; Wichita, Kansas; Davenport, Iowa; Colorado Springs, Colorado; and Overland Park, Kansas.

market, at any cost.[14] North American has not shown that the jury's assessment of the facts was unreasonable.

North American also claims that these individual indiscretions do not amount to "corporate" wrongdoing by North American. However, a corporate defendant is required to pay punitive damages so long as the employees were acting within the scope of their employment. *Webb Agency, Inc. v. Commercial Standard Ins. Co.*, 333 F. Supp. 966, 968 (E.D. Mo. 1971) (stating that it is "generally held that an agent's malice is imputable to the corporation making the latter liable for malicious, willful or criminal torts of its agents or employees within the scope of their employment"). And, interestingly, much of the improper activity occurred after Conseco filed suit, further reflecting the reprehensibility of North American's actions.

We find sufficient evidence of "malice or outrageousness" as defined by Missouri law to permit an award of punitive damages in this case. But in what amount? North American argues that the award is based solely on its net worth and is so excessive that it violates due process. No doubt the language of *State Farm*, in which the Supreme Court suggests that "four times the amount of compensatory damages might be close to the line of constitutional impropriety," is the foundation for North American's allegation of constitutional error. *State Farm*, 538 U.S. at 425 (citing *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)). The Court, however, went on to note that "[w]hile these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are

_____

[14] North American's senior manager in charge of the company's expansion into the subprime market, Ken Keeler, received compensation based on loan production. He earned a salary of $150,000 in 1999. In the year 2000 his salary increased to $400,000. And in 2001 North American paid Keeler a salary of $2,500,000. By his own admission, Keeler's increased compensation was due in part to his work in the company's subprime market expansion.

-20-

more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios of 500 to 1 [as in *Gore*], or in this case, of 145 to 1." *State Farm*, 538 U.S. at 425. However, the Court also explained that when compensatory damages are substantial, "perhaps [a punitive award] only equal to compensatory damages" may be appropriate. *Id*. Thus, because Conseco received a large compensatory award in this case–$3.5 million–in the "absence of extremely reprehensible conduct against the plaintiff or some special circumstance" the large exemplary award cannot stand unmodified. *Williams v. ConAgra Poultry Company*, (slip opinion August 6, 2004). As stated so eloquently–and simply–by Judge Posner of our sister circuit, "punitive damages should be proportional to the wrongfulness of the defendant's actions." *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003).

We are satisfied that North American's conduct was sufficiently reprehensible to support the jury's award of punitive damages. We are further convinced that North American's net worth was not the sole consideration in the jury's punitive award. However, because of the significant variance between the large actual damage award and the resulting punitive award, we must consider the nature of North American's conduct and the harm suffered solely by Conseco. After such consideration, we find that the $18 million punitive award does not comport with the requirements of the Due Process Clause. In order to avoid this constitutional infirmity, the punitive damages award must be remitted to $7 million, an amount that is sufficiently punitive, but that does not violate notions of fundamental fairness.

### III. *Conclusion*

In short, we see sufficient evidence that North American misused Conseco's trade secrets to justify the submission of the unfair competition claim and the tortious interference claim to the jury. Accordingly, we find no error in the district court's refusal to grant judgment as a matter of law on the unfair competition claim. Further,

we are satisfied with the sufficiency of the evidence supporting the jury's award of punitive damages. However, we cannot allow the punitive damage award to stand at $18 million, and remit the award to $7 million.

For the foregoing reasons, we affirm the opinion of the district court in part and reverse in part. We remand this case to the district court for entry of an amended judgment consistent with this opinion.

_____